Tracy Jay NIXON, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–94–00075–CR.

Court of Appeals of Texas,
El Paso.

Nov. 21, 1996.

Rehearing Overruled March 12, 1997.

Charles Louis Roberts, El Paso, for appellant.

Jaime E. Esparza, District Attorney, El Paso, for appellee.

Before LARSEN, McCLURE and CHEW, JJ.

## OPINION

CHEW, Justice.

This is an appeal from a conviction for the offense of indecency with a child. A jury convicted the Appellant, Tracy Jay Nixon, and after his plea of true to the State's enhancement allegations, sentenced him to 99 years' confinement in the Texas Department of Criminal Justice—Institutional Division. We affirm.

### Factual Background

At 4 p.m. on June 22, 1993, Tracy Nixon, finished his day's work as a construction foreman and left a construction site located in East El Paso. About an hour later, six-year-old J.J. and a friend were playing on the grounds of the Cielo Vista apartments in East El Paso. J.J. and her friend testified that a man approached them and told them that there were some dolls in the laundry room that might belong to them. The children went into the laundry room to look for the dolls. The man told J.J. that the dolls might be inside the dryer. When the child looked inside the dryer, the man lifted her skirt. J.J. told him to stop. Instead the man exposed his "private" to J.J. J.J.'s friend became frightened and ran out to get J.J.'s parents. J.J. attempted to leave the laundry room, but the man would not let her. At trial, J.J. identified Nixon as the man from the laundry room. J.J.'s mother testified that she and her husband, J.J.'s stepfather, were in their apartment on that afternoon when J.J.'s friend ran into the apartment

screaming that a man in the laundry room was going to take J.J. J.J.'s parents ran to the laundry room along with J.J.'s friend, calling J.J.'s name. J.J.'s mother saw a man in a light yellow car hurriedly back out of the parking lot. She was able to see the first three letters of the license plate on the car, CZB, and asked her husband to get the full number. J.J.'s stepfather was able to get part of the license plate number. He also saw the driver. He then called the police and reported the incident.

Officer Armitage arrived at the apartment complex and found J.J., J.J.'s family, and J.J.'s friend still standing in the parking lot. Officer Armitage spoke with them, getting a description of the car, the driver, and the license plate number. The license plate number, CZB 528, proved to be an invalid number. Officer Armitage left a case information card for follow-up and left the scene. The police made no further attempt to locate a suspect through the license plate number.

About two weeks after the incident, J.J. and her family were driving in the parking lot of a local shopping mall when J.J.'s mother saw what she thought to be the same car she had seen leaving the laundry room parking lot. She testified that she looked inside the car and recognized the driver as the man she saw leaving the laundry room. J.J.'s stepfather also testified that he recognized the car and the driver. They followed the car when it left the mall. During this time, J.J.'s mother and stepfather got the license plate number CZB ——. J.J.'s mother then called Detective Pantoja, who had been assigned to the case, and gave him the license plate number. CZB —— was registered to a 1986 Pontiac owned by Nixon.

Nixon appeals his conviction by ten points of error. The first point alleges reversible error in the form of inadmissible hearsay. The next five points allege error in failing to charge the jury on their consideration of the availability of parole. The final four points address testimony and prosecution argument allegedly commenting on Nixon's post arrest

silence. Each group of points is closely interrelated, therefore, we address each group together.

### 1. Hearsay Statement

■ Nixon alleges that the trial court committed reversible error in failing to sustain his objection during the following exchange between the prosecutor and Officer Armitage regarding the license number J.J.'s family gave Armitage at the time of the incident:

> State: What was the license plate number that was given to you?
>
> Defense: Objection. The question calls for hearsay.
>
> State: It's excited utterance, present sense impression.
>
> The Court: Overruled. You may respond.
>
> .    .    .    .    .
>
> Witness: They [J.J.'s family] gave me Texas, Charles Zebra Boyd 528.

Without further explanation, Nixon asserts that Officer Armitage's alleged hearsay testimony identifying the license plate number "formed a critical link" supporting the State's case "which had certain weaknesses in regard to the identification of the Appellant." Thus, Nixon appears to argue that the challenged testimony of the similar license plate number given at the scene makes it more likely that the family's identification of Nixon two weeks later is valid.

Armitage's testimony, however, is not the only evidence in the record of prior identification of a similar license plate number. J.J.'s mother testified, without objection, that she was able to identify the first three letters of the plate, CZB, when she observed the car speeding away from the laundry room. J.J.'s stepfather testified that he had been able to get the license plate "within two numbers" when he watched the car leave the scene.[1] This testimony establishes essentially the same fact Nixon complains was improperly

---

1. Although Nixon objected to J.J.'s stepfather's testimony on the ground that it was speculative, the trial court properly overruled the objection. J.J.'s stepfather testified that he got the correct license plate when the family spotted Nixon in the shopping center parking lot. He therefore had personal knowledge of the correct license plate number and also of how many numbers he correctly reported to police at the time of the incident.

established by Armitage's alleged hearsay: that the family reported a license number very similar to Nixon's correct plate number at the time of the incident. Any error in admitting the challenged testimony is harmless therefore. When alleged hearsay evidence is cumulative of the same evidence adduced from other witnesses, no reversible error is shown. See *Thomas v. State*, 621 S.W.2d 158, 164 (Tex.Crim.App.1981); *Huff v. State*, 560 S.W.2d 652, 653 (Tex.Crim.App. 1978). Accordingly, we overrule Point of Error One.

## 2. Failure to Give Charge on Consideration of Parole

■ In Points of Error Two through Six, Nixon complains that the trial court committed reversible error in failing to charge the jury on consideration of the parole law until after the jury sent two notes indicating that they might be considering parole in assessing punishment. During the jury's deliberations, the trial court received a message from the jury which read, "need the formula for time sentence and time served." The trial court notified counsel that she intended to reply: "There is no formula for you to apply in assessing punishment. You may only consider that evidence which is before you and the instructions of the court." Defense counsel objected and requested that the reply include a provision stating that the jury should only consider the sentence to be given, and not any time that the defendant was expected to actually serve. The court overruled Nixon's objection and request and submitted the reply as first stated. The jury sent another note asking, "What is the earliest parole on a sentence of life imprisonment versus 99 years?" The trial court proposed the following supplemental charge to counsel:

> I must now give you some additional law that I will charge you in this case. Under the law applicable in this case, the Defendant, if sentenced to a term of imprison-

ment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good time earned by the prisoner.

> It is also possible that the length of time for which the Defendant will be imprisoned might be reduced by the award of parole. Under the law applicable in this case, if the Defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed, or 30 years, whichever is less, without consideration of any good conduct time he may earn. Eligibility for parole does not guarantee that parole will be granted. It cannot accurately be predicted how the parole law and good conduct time might be applied to this Defendant if he is sentenced to a term of imprisonment because the application of these laws will depend on decisions made by prison and parole authorities.

> You may consider the existence of parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular Defendant. You are not to consider the manner in which the parole law may be applied to this particular Defendant.

The State had no objection. Nixon objected to the proposed charge and requested a charge instructing the jury not to consider parole at all. The trial court overruled the objection and the request. We note that the supplemental charge was correctly given in that it tracks the language of the instruction required by Tex.Code Crim.Proc.Ann. art. 37.07, § 4 (Vernon Supp.1997).[2]

---

2. Nixon correctly points out that Tex.Code Crim. Proc.Ann. art. 37.07, § 4(b) applies to this case and the supplemental charge the trial court gave corresponds to Section 4(a). The only difference in the two is that (b) would have instructed the jury that Nixon would have to serve at least one fourth of the sentence or 15 years, rather than one half of the sentence or 30 years as the supplemental charge read. Because the substance of the instruction under (a) and (b) is identical with the exception of the difference in the calculation, and because the error was actually favorable to Nixon, that is, the jury would have thought that he would have to serve more

Nixon alleges on appeal that the trial court erred in failing to give the Article 37.07, § 4 parole instruction with the original charge and again erred in not submitting it in response to the jury's first note. Finally, Nixon asserts that in response to the jury's second note, the trial court should have provided a stronger response than the Article 37.07, § 4 charge. When the trial court presented its initial proposed charge to the parties, defense counsel specifically stated that he had "no objection" to the charge. Although submission of the parole instruction is mandatory, any error caused by the trial court's initial failure to include it in the charge was waived by Nixon's failure to object to its absence. See *Kinnamon v. State,* 791 S.W.2d 84, 96 (Tex.Crim.App.1990); *Ramos v. State,* 831 S.W.2d 10, 17 (Tex.App.— El Paso 1992, pet. ref'd).

Nevertheless, the jury's second note made it obvious that the jury was on its own initiative, probably considering the effects of parole law in deciding between a 99 year sentence on the one hand and a life sentence on the other. As a result, we conclude the issue was revived, and it became incumbent upon the trial court to give the jury the appropriate instruction pursuant to Article 37.07, § 4. *See Ramos,* 831 S.W.2d at 18. In this case, the trial court submitted the appropriate instruction in response to the jury's second note, which appears to have come immediately after the jury received the trial court's response to the first note, and thus cured its own error. Nixon contends, however, that the jury had already started to consider parole, and it was therefore too late to cure the harm. We must disagree. Appellate courts generally presume the jury followed the instructions, but this presumption is rebuttable. *Ramos,* 831 S.W.2d at 18. We must therefore consider whether, in this case, Nixon rebutted the presumption that the jury followed the supplemental charge.

The instant facts show that although the jury appeared to be improperly considering parole, the trial court gave the jury the appropriate instruction in response. The punishment assessed in this case was close to

the maximum, but in light of Nixon's plea of true to three prior convictions, the lengthy sentence in and of itself does not necessarily indicate any improper consideration of parole or application of good time. We cannot know what was in the minds of the jurors as they deliberated. Their notes, however, provide some insight. The jury's second note indicated that they were probably attempting to decide between assessing 99 years on the one hand, or life on the other. The note seems to indicate that their decision between the two sentences might have been dependent upon the application of parole. There is no indication in the notes or elsewhere in the record whether consideration of good time or parole entered into the jury's determination to give one or the other of those sentences as opposed to a lesser one. Thus, on the facts of this case, we can only discern that the jury might have been considering parole in making a decision between a 99 year sentence and a life sentence. In the end, and after receiving the supplemental instructions, the jury came back with the lesser of the two sentences. On these facts, we cannot say that there is sufficient evidence to rebut the presumption that the jury fully followed the trial court's instructions on consideration of parole law once the trial court gave them, nor is there sufficient evidence to indicate a need for an additional, stronger instruction than the Article 37.07, § 4 instruction given.

Accordingly, we overrule Points of Error Two through Six.

### 3. Alleged Comments on Nixon's Post Arrest Silence

In Points of Error Seven through Ten, Nixon alleges that the prosecutor impermissibly referred to Nixon's post arrest silence on several occasions during questioning of witnesses and closing argument. Nixon complains of the following testimony elicited from Nixon by the State:

> State: Just like you pled innocent because you're not guilty, right?
>
> Appellant: I am not guilty.

---

time before parole eligibility, we do not find any harm in this particular error. Additionally, Nix-

on did not object to the instruction on this ground.

State: Okay. Just like you gave a statement to the police right up front because you weren't guilty, right?

Appellant: Not guilty.

State: So you gave them a statement, right, back on July 13th?

Appellant: No, sir.

Defense Counsel: Objection.

Appellant: No written statements have been taken from me.

State: But after you heard how the little girl testified, now you want to testify, right?

Appellant: Sir, I believe my testimony was planned long before today.

State: If we take your word for it, right, sir?

Appellant: You don't have to take my word for it.

State: You never made any other statements, did you?

Appellant: Why give a statement to the police?

State: Well, if you were innocent, maybe they would have dropped the charges.

$\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$

State: I can't ask you questions, you know that. I can't come over to you and ask you questions in the jail, can I?

Appellant: I don't know why not.

State: Ask him. You knew about your Fifth Amendment right, didn't you?

Appellant: Yes, I do.

State: You chose to exercise it at that time, didn't you?

Appellant: I have not exercised it yet.

State: Did you give a statement?

Appellant: Not written. Was I asked for one?

State: Okay. You did talk to the police?

Appellant: For a brief period, yes.

Nixon also complains of the following statement the prosecutor made during closing:

You know, it's so important, and Mr. Pinion [Defense Counsel] brings it out repeatedly, that Detective Pantoja somehow or another was negligent because he didn't immediately take long, sworn statements from people. Yet look at the Defense's witnesses. Where are their statements? Aren't you going to evaluate people on the same level? Where's their written statements?

### Impeachment

▌ It is well established that a defendant's post-arrest silence may not be used against him at trial. *Sanchez v. State,* 707 S.W.2d 575, 578 (Tex.Crim.App.1986). A comment on a defendant's post-arrest silence violates the Fifth Amendment prohibition against self-incrimination. *Doyle v. Ohio,* 426 U.S. 610, 617–18, 96 S.Ct. 2240, 2244–45, 49 L.Ed.2d 91 (1976); *Miranda v. Arizona,* 384 U.S. 436, 468, n. 37, 86 S.Ct. 1602, 1625, n. 37, 16 L.Ed.2d 694 (1966). It violates the defendant's right to be free from compelled self-incrimination under Article I, Section 10 of the Texas Constitution. *Sanchez,* 707 S.W.2d at 578; *Sutherlin v. State,* 682 S.W.2d 546, 548 (Tex.Crim.App.1984); *Cuellar v. State,* 613 S.W.2d 494, 495 (Tex.Crim. App.1981). A comment on a defendant's post-arrest silence is akin to a comment on his failure to testify at trial because it attempts to raise an inference of guilt arising from the invocation of a constitutional right. *Dinkins v. State,* 894 S.W.2d 330, 356 (Tex. Crim.App.1995).

▌ However, to preserve error concerning the erroneous admission of evidence, a defendant must timely object until receiving an adverse ruling. *Harris v. State,* 784 S.W.2d 5, 12 (Tex.Crim.App.1989); Tex. R.Crim.Evid. 103(a)(1). This rule applies to cases where the defendant claims that the State utilized his post-arrest silence for impeachment purposes. *Wheatfall v. State,* 882 S.W.2d 829 (Tex.Crim.App.1994); *see also, Smith v. State,* 721 S.W.2d 844, 855 (Tex. Crim.App.1986); *Rezac v. State,* 782 S.W.2d 869, 870 (Tex.Crim.App.1990); *Cisneros v. State,* 692 S.W.2d 78, 82–3 (Tex.Crim.App. 1985); *Cacy v. State,* 901 S.W.2d 691, 699 (Tex.App.—El Paso 1995, pet. ref'd). This allows the trial court to rule on the objectionable matter and to allow opposing counsel an opportunity to supply other testimony or to withdraw the evidence. *See Zillender v.*

*State,* 557 S.W.2d 515, 517 (Tex.Crim.App. 1977).

■ Nixon did not properly object to any of the prosecutor's questions implicating his post-arrest silence. The only objection in the record is to the question, "So you gave them a statement, right, back on July 13th?" Nixon did not, however, obtain a ruling on that objection, and the witness was allowed to continue testifying. The record shows that Nixon made no objection whatsoever to any of the other alleged comments on his post arrest silence. Thus, Nixon preserved nothing for our review. Though we strongly disapprove of the prosecutor's egregious remarks, we must nonetheless overrule Points of Error Seven through Nine.[3]

### Comments on Post Arrest Silence During Closing Argument

■ Nixon also failed to object to the prosecutor's argument. The Court of Criminal Appeals recently overturned the long-standing rule that a defendant need not object to incurable jury argument in order to preserve error. *Cockrell v. State,* 933 S.W.2d 73, 100 (Tex.Crim.App.1996)(overruling *Romo v. State,* 631 S.W.2d 504 (Tex.Crim. App.1982) and *Montoya v. State,* 744 S.W.2d 15, 37 [Tex.Crim.App.1987] ). Consequently, a defendant must now object at trial and obtain an adverse ruling in order to complain on appeal of erroneous incurable jury argument. Accordingly, we must also overrule Point of Error Ten.

Having overruled all points of error, the judgment of the trial court is affirmed.

---

[3.] This issue has been the focus of painstaking consideration by the Court. As issued, it reflects the effort of the Court to follow the jurisprudence and precedent of the day to provide coherent and consistent interpretation of that jurisprudence. It is the author's constitutional duty and obligation to follow the law as announced by our superior courts. That does not mean that I necessarily agree with those interpretations and rulings. It is recognized that the right to remain silent, though immune from destruction by the United States and Texas constitutions, is not immune from statute and regulation for the common good. But this case, because of its specifics, calls into question the seeming elevation of procedural rules over basic principles that guarantee a defendant a fair trial.