**Steven Howard RANEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–96–158–CR.**

Court of Appeals of Texas,
Waco.

Dec. 3, 1997.

Rehearing Overruled Jan. 7, 1998.

---

Kerry P. Fitzgerald, Dallas, Michael N. Buckley, Grand Prairie, for appellant.

Joe F. Grubbs, County and District Attorney, Waxahachie, for appellee.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

DAVIS, Chief Justice.

Appellant Steven Howard Raney pled guilty before a jury to the felony offense of tampering with physical evidence. *See* Tex. Pen.Code Ann. § 37.09(a)(1) (Vernon 1994). The jury assessed Raney's punishment at ten years' confinement and a $5,000 fine.

In eight points Raney argues that his conviction should be reversed because:

- the trial court failed to admonish him of the deportation consequences of his plea, which rendered the plea involuntary;
- he was denied effective assistance of counsel under the Texas Constitution and under the federal constitution;
- he was denied due process under the federal constitution or due course of law under the state constitution due to prosecutorial misconduct; and
- the evidence is factually and legally insufficient to sustain his conviction.

We will reverse the judgment and remand this cause for a new punishment hearing.

## FACTUAL BACKGROUND

The State's indictment alleges that on or about December 5, 1995, Raney intentionally and knowingly concealed a quantity of cocaine knowing that an investigation was in progress concerning the persons found in possession of the cocaine and with intent to impair the concealed cocaine's availability as evidence in the investigation.

Raney was employed as a deputy constable. On December 5, Deputy Constable Todd McGilvray and he observed a car traveling north on Interstate 35 which was occupied by two Hispanics, bore out-of-state license plates, and "bump[ed] the white line a couple of times." The car exited the interstate, and the officers stopped it on U.S. Highway 77 at the Waxahachie city limits. The deputies placed the driver of the car under arrest after determining that he had an outstanding warrant from another county.

The driver and his passenger refused to consent to a search of the car. Raney's narcotics dog "alerted" at the rear quarter panel of the car. Raney then searched the trunk of the car and recovered a "kilo"[1] of cocaine enclosed in a cellophane wrapper. The officers transported the suspects and their car to the office of the Justice of the Peace in Midlothian. At the J.P. office, the officers discovered another kilo of cocaine hidden in the car. Waxahachie Police Officer Matthew Boyden made a small incision in one of the kilos which revealed a white substance, confirming the officers' suspicions.

By the time the contraband was taken inside, several officers from other agencies had arrived at the J.P. office. Deputy Constable Rodney Ramsey cut into the kilo in which Boyden had made the incision and "basically exposed the entire kilo." Boyden testified that at this point the cocaine was "real hard" and could not be poured out of its packaging. Ramsey informed McGilvray and the other officers that because the scale they had only measured up to 200 grams, he intended to cut the kilo into smaller pieces and weigh each piece. Raney's supervisor, Constable Perry Curry, advised that this would be unnecessary. Curry and McGilvray left the room to locate duct tape and a plastic bag in which they intended to secure the evidence. By this time, the other officers present had also left, leaving Raney and Ramsey alone with the cocaine. Curry and McGilvray returned shortly thereafter. Curry securely wrapped the kilo Ramsey had cut open with duct tape and placed both kilos in the plastic bag.

Raney and McGilvray took the evidence to the Waxahachie Police Department for safekeeping. Raney kept the key to the locker in which they stored the cocaine. Raney, McGilvray, and Boyden agreed to meet the next morning to complete the necessary paperwork, retrieve the suspected cocaine, and take it to the Department of Public Safety laboratory in Garland for analysis.

Raney called McGilvray the next morning and informed him that he could not meet at the agreed time because his wife and children were ill. Raney asked McGilvray to come to his house about an hour after they had originally agreed to meet. When Raney answered his door, he appeared "very ill himself. . . . His eyes were very red and sunken. He was very pale." McGilvray told Raney that Boyden and he would complete the paperwork and then take the evidence to the laboratory. Raney informed McGilvray that he had already retrieved the cocaine from the evidence locker.

McGilvray returned to Raney's house with Curry to pick up the evidence. According to Curry and McGilvray, they went through Raney's garage and met him at his door, where he gave them the narcotics. The bag containing the suspected cocaine was open when Raney gave it to the officers. Curry and McGilvray transported the cocaine to the Waxahachie Police Department, where they met Boyden. Boyden testified that when the officers brought the evidence to him that morning, the kilo which had been wrapped with duct tape "was open and there was a lot of powder that had fallen out in the bottom of the blue sack." He described the cocaine as "loose and not in too good a shape." Boyden field-tested some of the loose cocaine. He then placed the evidence in a sealed bag and assisted Curry and McGilvray in preparing the necessary paperwork.

Curry and McGilvray took the evidence to the DPS lab in Garland. When they arrived at the lab, they found that someone had further tampered with the cocaine. A portion of the duct tape which Curry wrapped around the kilo had been peeled back and replaced. Underneath this tape, the officers discovered another incision in the package. McGilvray testified that Raney was the only person with access to the cocaine after they stored it in the locker. Curry, McGilvray, and Boyden all denied making this other incision.

A DPS criminalist tested the two kilos and found that each contained more than 950 grams of cocaine. He testified that the package which the officers had cut open and resealed had apparently been cut open again

---

1. A supervisor in the Department of Public Safety's Garland office testified that a "kilo" of cocaine represents 1,000 grams of cocaine, i.e., a kilogram of cocaine.

and that the bag in which the evidence was packaged arrived at the laboratory with some tears in it. He stated that neither he nor any other lab employee made the incision discovered by Curry and McGilvray when they delivered the cocaine to the lab for testing.

Early in the morning of December 7, a Waxahachie police officer discovered a Chevrolet Blazer which had run into a ditch and had been abandoned by its driver. The vehicle was registered to Raney. The officer found Raney's badge and wallet in the console. The police department contacted Curry and advised him of this discovery.

The officers conducted an unsuccessful search for Raney. At some point after Curry arrived at the scene, Raney made a 911 phone call telling the police of his location. Curry advised that an officer needed to bring Raney to the accident scene. Boyden and Ramsey both drove to Raney's location. Boyden arrived first and did not see Raney. He called Raney's name. Raney asked who was calling in response to which Boyden identified himself. Raney then walked out from behind the store from which he had called 911. Boyden recalled that Raney appeared "[k]ind of wild," "disoriented," and had "several scrapes and cuts and dirt and torn clothing." Raney asked Boyden why he had been following him all day. Boyden asked Raney to get in Boyden's truck. However, Ramsey led Raney away from Boyden and other officers who had arrived at the store and, according to Boyden, "appeared to be keeping [Raney] away from [Boyden]."

Ramsey drove Raney to the scene where he had abandoned his Blazer. When they arrived, Ramsey approached Curry and told him that Raney was scared and believed people were chasing him. Raney told Curry a story about how he had been chased by two vehicles which abandoned their pursuit after he ran into the ditch. Curry believed he was under the influence of some substance but did not smell alcohol on his breath. Ramsey drove Raney home.

Curry and Boyden went to Raney's home shortly thereafter. Raney reiterated his story with variations. According to Boyden, Raney's "story changed several times and

continued to deteriorate to the point where he was getting caught up on his stories and things were just changing." Raney refused to submit a specimen of his blood or urine for analysis. At that point, Curry asked Raney for his badge and identification card. Raney explained to Boyden that he did not want to provide a specimen because he had placed his finger on the cocaine when they opened it at the J.P. office and then touched the finger to his tongue.

Raney asked the officers to talk with him privately in his garage. There, he advised the officers that Ramsey and he had taken some of the cocaine. The officers stopped the conversation and took Raney to the police station. At the station, Boyden gave Raney the required statutory warnings. *See* Tex.Code Crim.Proc.Ann. art. 38.22, § 2(a) (Vernon 1979). Raney then gave the officers an oral confession which Boyden reduced to typewritten form. Raney confessed that Ramsey and he took some of the cocaine for themselves when they were left alone with it at the J.P. office. He stated in pertinent part that

> Ramsey removed a cellophane cigarette package and I looked at him funny. He then put some cocaine from the kilo into his clear cellophane bag. I told him not to do that, but he said nobody would ever know. I told him not to because it would count against my weight. He told me to get an envelope and he put some more cocaine into it for me.... He then put his bag of cocaine in his shirt pocket and left. I took my envelope and put it in my pant's pocket.

In the confession, Raney states that he retrieved the cocaine from the police department at 6:30 on the morning of December 6 and that it stayed in his trunk until Curry and McGilvray came and got it. Raney also describes how he snorted the cocaine with a straw that afternoon.

To demonstrate his cooperation with the investigation, Raney agreed to call Ramsey and ask him to bring the cocaine back. He also gave Boyden written consent to search his home for the straw and the envelope.

Boyden recorded Raney's conversation [2] with Ramsey. After the conversation, Raney took Boyden to a shed behind his house where he had hidden the envelope and straw, and Boyden recovered these items.

The State called a lieutenant with the DPS narcotics service in Garland to testify about the appropriate manner in which officers should take and maintain custody of suspected narcotics in order to preserve the integrity of the evidence. The lieutenant testified that in his opinion the persons arrested by Raney and McGilvray for possessing the two kilos of cocaine could not now be prosecuted because "[the State has] no evidence. That evidence might as well be gone. There's no integrity in that evidence and the people that were transporting it; there's no way to prosecute those people." The lieutenant also testified that a person will remain under the influence of cocaine for only an hour or slightly longer.

Raney testified in his own defense. He admitted consistent with his confession that he placed the envelope containing cocaine in his pants' pocket. He insisted that after he retrieved the evidence from the locker it remained in his car trunk, and he denied ever taking it inside his house. Raney's trial counsel asked, "Did you realize that certainly [your tampering with the cocaine] would compromise, if not completely destroy, the prosecution of these two Hispanics that you had arrested out there on the 5th of December?" Raney responded affirmatively.

The prosecutor concluded his cross examination of Raney with this question:

Prosecutor: How does it feel to know that two first-degree felonies with a potential punishment range of ten years to 99 years or life and a potential $100,000 fine will never even see this courtroom because you and Rodney Ramsey took some of this cocaine after you caught them on the highway? How does that feel to you?

Raney: It hurts very much.

Raney called a deputy sheriff as one of his witnesses. The deputy testified that he had known Raney for thirty years and believed him to be a good candidate for probation. In the State's cross-examination of the deputy, the State asked:

Prosecutor: If [police officers] steal drugs and use them, if they cost the ability of the State to prosecute first-degree felons for two kilos of cocaine, do you think those guys ought to be punished?

Witness: If they're stealing for use, I think they should be rehabilitated.

Prosecutor: No. Answer my question. This is not a hard question.

Witness: Well, if—

Prosecutor: No. No. I don't want to hear your speech. Do you think they should be punished?

Witness: I believe they should be rehabilitated. To me, rehabilitation is punishment.

Prosecutor: You are so interested in trying to help your friend that you're selling your own conscience, Mr. Altman.

Witness: No. I'm trying to answer your question.

Prosecutor: No, you're not. You're trying to avoid answering my question. And my question is—

The court sustained Raney's objection that the prosecutor was arguing with the witness.

Prosecutor: My question is: If officers take drugs and use them, drugs that they got under the cloak of the State of Texas, under the power of the State of Texas, which power they have abused, do you think they should be punished.

Witness: To a fittable punishment, yes.

In its closing argument the State continued its theme that Raney's conduct emasculated the State's ability to prosecute the two persons whom Raney and McGilvray had arrested in possession of the cocaine on De-

---

**2.** In Raney's conversation with Ramsey, Raney asked him to return the cocaine he had taken because Raney felt guilty about what they had done. Ramsey initially declined because he did not want to jeopardize his career in law enforce- ment. Toward the end of the conversation, however, Ramsey appears to say that if Raney wanted to return the cocaine, he could do so, but Ramsey would not do it himself.

cember 5. The prosecutor began his closing argument by urging the jury to sentence Raney to the maximum sentence. He argued:

> I'm going to tell you why I think it's important. You know as a district attorney in this county I'd rather be prosecuting those two people that got caught carrying those two kilos of cocaine in this county, but that's gone. That's history, into the wind because of this man's selfish and illegal act.

As previously stated, the jury sentenced Raney to the maximum term of confinement allowed and assessed a substantial fine.

## THE COURT'S ADMONISHMENTS

Raney argues in his first point that his conviction should be reversed because the court failed to admonish him of the potential deportation consequences of his plea. His second point asserts that because the court failed to advise him of these potential consequences, his plea was involuntary and obtained in violation of article I, section 19 of the Texas Constitution. The parties do not dispute that the court wholly failed to admonish Raney that if he were not a citizen of the United States, his guilty plea could result in his deportation. *See* TEX.CODE CRIM.PROC. ANN. art. 26.13(a)(4) (Vernon 1989).

■ If the court fails to admonish a defendant of the potential deportation consequences of his plea, we must determine whether that failure requires reversal under the harmless error standards found in the Rules of Appellate Procedure. *Cain v. State,* 947 S.W.2d 262, 264 (Tex.Crim.App.1997).

## TEX.R.APP.P. 44.2

■ Texas Rule of Appellate Procedure 44.2 governs how harm is assessed after error is found in criminal cases.[3] Subsection (a) governs constitutional error, where "the court of appeals must reverse ... unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX.R.APP.P. 44.2(a). The error presented in this case is statutory, rather than constitutional, in nature. Thus, we apply subsection (b) of the rule.

### Non–Constitutional Error

■ Subsection (b) provides: "Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX.R.APP.P. 44.2(b). The language in 44.2(b) mirrors that found in Federal Rule of Criminal Procedure 11(h),[4] which provides that "[a]ny variance from the procedures required by this rule which does not affect substantial rights shall be disregarded." FED.R.CRIM.P. 11(h). Rule 11 of the Federal Rules of Criminal Procedure sets forth the procedures which federal courts are to follow when receiving a guilty plea from an accused. *See* FED.R.CRIM.P. 11. Because of the similarity of the federal rule to our state rule, we turn to federal cases construing Rule 11(h) for guidance in applying our new standard.

The Supreme Court has not addressed the appropriate application of Rule 11(h), but the federal courts of appeals have given it much attention. Some general principles have de-

---

**3.** The Court of Criminal Appeals has declared that the new Rules of Appellate Procedure apply to all cases pending on September 1, 1997, "except to the extent that in the opinion of the court their application in a particular proceeding then pending would not be feasible or would work injustice, in which case the former procedure may be followed." *Final Approval of Revisions to the Texas Rules of Appellate Procedure* (Tex. Crim.App. Aug. 15, 1997) (order adopting new appellate rules).

**4.** The rule also mirrors Rule 52(a) of the federal rules, which provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." FED. R.CRIM.P. 52(a). This is the general "harmless

error" provision of the federal rules. However, in the context of plea proceedings, Rule 11(h) specifically applies to errors committed by a federal trial court when admonishing a defendant of the consequences of his plea. *See* FED.R.CRIM.P. 11(h). The Supreme Court adopted this specific provision in 1983 in response to its own 1969 decision in *McCarthy v. United States,* in which the Court held that a trial court's failure to comply with the requirements of Rule 11 requires reversal. 394 U.S. 459, 463–64, 89 S.Ct. 1166, 1169, 22 L.Ed.2d 418 (1969); *see* FED. R.CRIM.P. 11 advisory committee's note at 362 (West 1986) (explaining that the circumstances justifying the *McCarthy* decision no longer exist).

veloped from these cases, even though no definitive test has been adopted by the courts. The Fifth Circuit has taken the position that a Rule 11 error is harmless unless "the defendant's knowledge and comprehension of the full and correct information would have been likely to affect his willingness to plead guilty." *United States v. Johnson,* 1 F.3d 296, 302 (5th Cir.1993). Other circuits have followed this rationale. *See United States v. Goins,* 51 F.3d 400, 402 (4th Cir. 1995) (quoting *Johnson* ); *see also United States v. Cross,* 57 F.3d 588, 591 (7th Cir. 1995); *United States v. Cotal–Crespo,* 47 F.3d 1, 7 n. 5 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 94, 133 L.Ed.2d 49 (1995) (finding *Johnson* "persuasive").

The Court of Appeals for the District of Columbia has enunciated a somewhat different test. This court has observed that a Rule 11 error is harmless "if the record reveals that either the defendant had actual notice of the information that the district judge failed to convey or that the information would not have been important to the defendant [in making his decision to plead guilty]." *United States v. Dewalt,* 92 F.3d 1209, 1214 (D.C.Cir.1996). This appears to be only a slight variation of the Fifth Circuit test that to be harmful the failure to admonish "would have been likely to affect [the defendant's] willingness to plead guilty." *Johnson,* 1 F.3d at 302.

### The Burden of Proof

■ To determine who bears the burden of proving harm, we again look to federal precedents. The Court of Appeals for the District of Columbia squarely places the burden on the prosecution to demonstrate that a Rule 11 error is "harmless." *United States v. Lyons,* 53 F.3d 1321, 1322 n. 1 (D.C.Cir.

1995); *accord Dewalt,* 92 F.3d at 1213. However, our research has found no other federal appellate court placing the burden in this manner. Rather the courts seem to uniformly agree that in conducting the analysis, the appellate court must review the "totality of the circumstances" surrounding the plea proceeding. *Cross,* 57 F.3d at 591; *Cotal–Crespo,* 47 F.3d at 4; *United States v. Abreo,* 30 F.3d 29, 32 (5th Cir.1994).

The Supreme Court has intentionally phrased the issue of reviewing other errors in terms of "grave doubt." *O'Neal v. McAninch,* 513 U.S. 432, 434–38, 115 S.Ct. 992, 994–95, 130 L.Ed.2d 947 (1995) (applying FED.R.CRIM.P. 52(a)). "The case before us does not involve a judge who shifts a burden to help control the presentation of evidence at a trial, but rather involves judges who apply a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect." *Id.,* 513 U.S. at 436, 115 S.Ct. at 995.[5] Thus, neither party has a burden under Rule 44.2(b).

### Summary

In summary, when we assess harm under Rule 44.2(b) flowing from a failure to comply with article 26.13, we review the entire [6] record to determine whether "the defendant's knowledge and comprehension of the full and correct information would have been likely to affect his willingness to plead guilty." *Johnson,* 1 F.3d at 302; *accord Williams v. State,* 522 S.W.2d 483, 485 (Tex.Crim.App.1975); *Fimberg v. State,* 922 S.W.2d 205, 207 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd). If so, we must conclude that the error harmed the defendant in such a way as to require a new trial. Otherwise, we should disregard the error.

---

5. The Court of Appeals for the District of Columbia itself followed this practice in the two cases cited when it examined the record in each case to determine if the respective appellant's "substantial rights" had been affected by the Rule 11 errors. *See United States v. Dewalt,* 92 F.3d 1209, 1214–15 (D.C.Cir.1996); *United States v. Lyons,* 53 F.3d 1321, 1322–23 (D.C.Cir.1995). After examining the record in *Dewalt,* the court determined that the prosecution failed to meet its "burden of persuading [the court] that the Rule 11 error did not affect the outcome of this prosecution." *Dewalt,* 92 F.3d at 1214. The court

reached the opposite conclusion in *Lyons.* *Lyons,* 53 F.3d at 1322–23.

6. Although we review the entire record, "we shall consider only such information contained therein as is temporally relevant to the voluntary and uncoerced nature of the defendant's guilty plea, and to his knowledge and understanding of the nature of the charges and the consequences of his plea." *United States v. Johnson,* 1 F.3d 296, 298 (5th Cir.1993).

## Application

■ The Court of Criminal Appeals has determined under the former harmless error standard that the failure to admonish a defendant of the potential deportation consequences of his guilty plea is harmless if the record reflects that the defendant is a citizen of the United States. *Cain*, 947 S.W.2d at 264; *Matchett v. State*, 941 S.W.2d 922, 929–30 (Tex.Crim.App.1996).

Raney testified that he was born in Waxahachie, Texas. Thus, the record reflects that he is a citizen of the United States. *See id.* at 930. Because Raney is a citizen, we conclude that the failure of the court to admonish him of the potential deportation consequences of his plea "would [not] have been likely to affect his willingness to plead guilty." *Johnson*, 1 F.3d at 302. Because the failure to admonish did not affect Raney's "substantial rights, [it] must be disregarded." TEX.R.APP.P. 44.2(b). Thus, we overrule Raney's first point.

Raney argues in his second point that because the court did not admonish him of the potential deportation consequences, he did not fully appreciate or understand the consequences of his plea. Thus, he contends his plea was involuntary and obtained in violation of the due course of law provision of article I, section 19 of the Texas Constitution.

The record reflects that Raney is a citizen. Thus, deportation is not a possible consequence of his plea. Raney essentially argues that his plea was involuntary because the court failed to admonish him concerning a non-consequence of his plea. We cannot accept this proposition. The failure to admonish Raney of the deportation consequences which would potentially attach to the plea of a non-citizen, but not at all to his own, did not affect his "substantial rights." Accordingly, we must disregard it. TEX.R.APP.P. 44.2(b). We overrule Raney's second point.

## SUFFICIENCY OF THE EVIDENCE

■ Raney attacks the factual and legal sufficiency of the evidence to support his conviction in his seventh and eighth points respectively. Specifically, he argues that the State failed to prove that he "concealed" the cocaine as alleged in the indictment.

Raney pled guilty to the jury. He then testified on his own behalf during the punishment phase of his trial. Counsel asked him, "And you pled guilty because you are guilty?" To which Raney replied, "I am guilty."

When an accused judicially admits his guilt in a jury trial, he waives the right to complain that the evidence is either legally or factually insufficient to support his conviction. *Hoffman v. State*, 922 S.W.2d 663, 672 (Tex.App.—Waco 1996, pet. ref'd). This rule applies equally to cases where the accused admits guilt during the guilt-innocence phase of his trial, where the accused admits guilt at the punishment phase of trial following a guilty verdict by the jury, and where the accused admits guilt at the punishment phase of a trial like Raney's which is not bifurcated because of a guilty plea to the jury. *Id.*

Therefore, because Raney judicially admitted his guilt, he has waived the right to challenge the legal or factual sufficiency of the evidence. Accordingly, we overrule his seventh and eighth points.

## PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL

Raney avers in his fifth and sixth points respectively that the prosecution engaged in misconduct which violated his rights to due process under the federal constitution and due course of law under the state constitution. U.S. CONST. amends V, XIV, § 1; TEX. CONST. art. I, § 19. He asserts by his third and fourth points respectively that his trial counsel rendered ineffective assistance under the state and federal constitutions by failing to object to these acts of prosecutorial misconduct. U.S. CONST. amends. VI, XIV, § 1; TEX. CONST. art. I, § 10.

### THE ALLEGED MISCONDUCT

Raney identifies three separate situations where the prosecution engaged in misconduct. His primary complaint focuses on the prosecution's interrogation and argument informing the jury that the State cannot prose-

cute the two persons arrested with the cocaine because of Raney's tampering with the evidence. He also suggests that the prosecutor improperly cross-examined him by stating that the State would be able to subpoena him a month later to testify against his codefendant regardless of Raney's willingness to testify. Finally, he contends that the prosecutor improperly cross-examined him about whether Curry and McGilvray had lied when they testified that he gave them the cocaine from inside his house.

### THE APPLICABLE LAW

#### 1. Prosecutorial Misconduct

■ When the prosecution asks an improper question or admits improper testimony, any error resulting therefrom "may be cured or rendered harmless by its withdrawal or an instruction to disregard." *Carter v. State*, 614 S.W.2d 821, 824 (Tex.Crim.App. [Panel Op.] 1981); *accord Easter v. State*, 867 S.W.2d 929, 934 (Tex.App.—Waco 1993, pet. ref'd). Such misconduct will mandate reversal only "where it appears that the question or evidence is clearly calculated to inflame the minds of the jury and is of such a character so as to suggest the impossibility of withdrawing the impression produced on the juror's [sic] minds." *Carter*, 614 S.W.2d at 824–25; *accord Easter*, 867 S.W.2d at 934.

■ When the accused chooses to testify on his own behalf, he generally subjects himself to the same cross-examination as any other witness. *Bryan v. State*, 837 S.W.2d 637, 643 (Tex.Crim.App.1992). The exception occurs when constitutional or statutory protections limit such cross-examination. *Id.* The privilege against self-incrimination serves as one of the limitations on the prosecution's cross-examination of an accused. *See Sanchez v. State*, 707 S.W.2d 575, 582 (Tex.Crim.App.1986).

■ The courts rarely reverse cases because of an improper question propounded to the accused. *Cavender v. State*, 547 S.W.2d 601, 603 (Tex.Crim.App.1977); *Shepherd v. State*, 766 S.W.2d 564, 565 (Tex. App.—Houston [1st Dist.] 1989, no pet.). To require reversal, the cross-examination must have been "obviously harmful." *Cavender*,

547 S.W.2d at 603. As with other inadmissible evidence, a prompt instruction to disregard or withdrawal of the testimony generally cures or renders harmless any error arising from such improper cross-examination. *Id.*

■ Improper argument by the prosecution will not usually require reversal unless it:

(1) is violative of a statute;

(2) injects a new and harmful fact into the case; or

(3) is manifestly improper, harmful and prejudicial to the rights of the accused. *Wilson v. State*, 938 S.W.2d 57, 59 (Tex.Crim. App.1996).

#### 2. Ineffective Assistance of Counsel

■ Raney carefully briefs his state and federal arguments separately on the issue of ineffective assistance. He suggests that different appellate standards should apply to each. However, the Court of Criminal Appeals has held that the same standard applies under both state and federal claims of ineffective assistance of counsel. *Hernandez v. State*, 726 S.W.2d 53, 56–57 (Tex.Crim.App. 1986). Accordingly, we consider these points together.

In assessing the effectiveness of counsel during the guilt-innocence phase of trial, we apply the test set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Ex parte Jarrett*, 891 S.W.2d 935, 938 (Tex.Crim.App.1994). *Strickland* requires us to determine whether:

(1) counsel's performance was deficient; and if so,

(2) whether there is a reasonable probability the results would have been different but for counsel's deficient performance. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

We strongly presume that counsel's conduct lies within the "wide range of reasonable representation." *McFarland v. State*, 928 S.W.2d 482, 500 (Tex.Crim.App.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997). The accused must overcome this presumption by affirmatively show-

ing that his representation fails the two-part test set forth in *Strickland.* *Id.*

When assessing the effectiveness of counsel during the punishment phase, however, we apply the reasonably effective assistance test set forth in *Ex parte Duffy.* 607 S.W.2d 507, 516 (Tex.Crim.App.1980). That is, we determine "whether counsel was reasonably likely to render effective assistance and whether counsel reasonably rendered effective assistance." *Ex parte Langley,* 833 S.W.2d 141, 143 (Tex.Crim.App. 1992). Generally we examine the totality of the representation in gauging the effectiveness of counsel. *Ex parte Raborn,* 658 S.W.2d 602, 605 (Tex.Crim.App.1983). In some situations however, a single omission on counsel's part can be considered ineffective assistance. *Ex parte Felton,* 815 S.W.2d 733, 735 (Tex.Crim.App.1991).

A defense attorney "must have a firm command of" the law applicable to his client's case before he can provide reasonably effective assistance. *Duffy,* 607 S.W.2d at 516. In *Ex parte Felton,* the defense counsel failed to object to the State's use of a void conviction for enhancement purposes. Counsel conceded at a subsequent hearing that his failure to object resulted from his misunderstanding of the applicable law. The Court concluded that his unfamiliarity with the law made it unlikely that he could render effective assistance and that he "did not in fact render effective assistance." *Id.* at 736; *accord Ex parte Canedo,* 818 S.W.2d 814, 815 (Tex.Crim.App.1991) (counsel's erroneous belief that his client could not receive probation from the jury and recommendation that client have court assess punishment was not reasonably effective assistance of counsel because client could in fact have received probation from the jury).

Raney suggests that because his plea was involuntary due to the court's failure to admonish him, the *Strickland* test applies. However, we have already decided that Raney's plea was not involuntary. Moreover, we have previously held that the *Duffy* test is the appropriate standard to apply in cases where the defendant has pled guilty to the jury. *Ware v. State,* 875 S.W.2d 432, 434 (Tex.App.—Waco 1994, pet. ref'd). Accordingly, we will apply the *Duffy* standard.

APPLICATION OF THE LAW TO THE FACTS

1. The Lost Prosecution

The evidence conclusively establishes that Raney and Ramsey tampered with one of the kilos which they seized on December 5. This tampering was accomplished by concealing, removing, and consuming a portion of the evidence. Curry, Boyden, and McGilvray provide sufficient testimony to establish the chain of custody for the seized evidence. The parties do not dispute that neither Raney nor Ramsey disturbed the second kilo.

To adequately establish a chain of custody for such evidence, the State must offer sufficient proof to connect the evidence to the defendant and to the offense with which he is charged, "evidence having that degree of security and integrity to justify its admission." *Moore v. State,* 821 S.W.2d 429, 431 (Tex.App.—Waco 1991, no pet.); TEX. R.CRIM.EVID. 901(a). Mere " 'theoretical breaches in the chain of custody' will not affect admissibility in [the] absence of 'affirmative evidence of tampering or commingling.' " *Moore,* 821 S.W.2d at 431 (quoting *Stone v. State,* 794 S.W.2d 868, 870 (Tex. App.—El Paso 1990, no pet.)).

The more difficult question presented is what occurs when the defense does offer evidence of tampering. The Dallas Court of Appeals confronted a somewhat similar situation in *Wallace v. State,* 770 S.W.2d 874 (Tex.App.—Dallas 1989, pet. ref'd). In *Wallace,* an undercover informant bought a quantity of methamphetamine from Wallace. The informant wore a body microphone to record the transaction. The informant obtained the drugs from Wallace, injected a portion of the methamphetamine into his arm, and then paid Wallace for the narcotics. The informant subsequently gave the remainder of the methamphetamine to an officer.

Wallace argued on appeal that the court erred in admitting the methamphetamine in evidence because the State failed to prove the chain of custody and because the substance had been altered or destroyed by the

informant's consumption of a portion of it. The court did not directly address his claim that the methamphetamine was altered or destroyed by the informant's conduct. However, the court did hold that the mere consumption of a portion of the seized narcotic did not affect the chain of custody but merely reduced the amount of methamphetamine for which he could be prosecuted. *Id.* at 877.

We believe the same rule would apply should the State choose to prosecute the two persons arrested on December 5 for possession of the cocaine seized. Moreover, the parties do not dispute that neither Raney nor Ramsey tampered with the second kilo seized. Because there is no "affirmative evidence of tampering or commingling" with respect to the second kilo, we can fathom no reason why any "theoretical breaches in the chain of custody" would bar the State from prosecuting these individuals on the basis of the second kilo alone.[7] *Moore,* 821 S.W.2d at 431.

In this case, the State began to sound the theme during its case in chief that Raney's conduct had eliminated any possibility that the two persons arrested with the cocaine would ever be prosecuted. It continued this theme in its cross-examination of Raney and one of his witnesses. Finally, the State began its final argument by essentially telling the jury that Raney should go to prison because he had destroyed the State's case against the other two suspects. Raney's trial counsel, himself, contributed to the State's erroneous theme when he questioned his own client about the perceived fact that the State's case against these others was destroyed.

As stated above, the courts rarely reverse cases because of improper questions or testimony. *Cavender,* 547 S.W.2d at 603. Such errors can generally be corrected by withdrawal of the testimony or a prompt instruction to disregard it. *Carter,* 614 S.W.2d at

824–25. However, no such withdrawal or instruction was given in this case. Moreover, the prosecutors repeated their improper refrain that the prosecution of the persons arrested with the cocaine was lost throughout the trial.

An instruction to disregard this testimony in the first instance would likely have eliminated any harm. *See id.* However, Raney's trial counsel failed to object or request such an instruction when the prosecution commenced this improper theme. Thus, this misconduct has not been properly preserved for appellate review. *See Wheatfall v. State,* 882 S.W.2d 829, 836 (Tex.Crim.App.1994).[8]

### 2. The State's Ability to Subpoena Raney for Ramsey's Trial

 The privilege against self-incrimination does not expire upon a finding of guilt. *Brown v. State,* 617 S.W.2d 234, 237 (Tex. Crim.App.1981). "[T]he privilege ceases only when liability to punishment no longer exists." *Id.* (quoting *Brumfield v. State,* 445 S.W.2d 732, 741 (Tex.Crim.App.1969)) (on rehearing); *accord Bryan,* 837 S.W.2d at 643. A conviction does not become final until any appeals are resolved. *Jones v. State,* 711 S.W.2d 634, 636 (Tex.Crim.App.1986). Thus, an accused's "liability to punishment" does not cease until his appeal has been finally adjudicated.

In this case, even though Raney had pled guilty, his liability to punishment had not yet terminated. Although it is undoubtedly true that had Raney not pursued this appeal his privilege against self-incrimination would have expired "in a month" after trial, Raney did pursue this appeal. The State may not trample upon this sacred constitutional right and then seek to excuse itself by arguing that no error occurred because the accused might have foregone his appeal.

---

7. These observations must not be construed as an advisory opinion as we are not empowered to render such. *See Ex parte Current,* 877 S.W.2d 833, 837 n. 2 (Tex.App.—Waco 1994, no writ) (expunction appeal).

8. Moreover, counsel reinforced this improper theme in his direct examination of Raney. Thus,

under the doctrine of curative admissibility, this issue has not been properly preserved for appellate review. *See McGlothlin v. State,* 896 S.W.2d 183, 189 n. 9 (Tex.Crim.App.1995) ("when a defendant offers the same evidence to which he earlier objected, he is not in a position to complain on appeal").

However, a prompt instruction to disregard the prosecutor's question before Raney answered would have in all likelihood rendered the erroneous question harmless. *See Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim.App.1995). Counsel's failure to object to the question and request such an instruction allowed this improper testimony to reach the jury. Moreover, counsel's failure to object means that this allegation of prosecutorial misconduct has not been properly preserved for appellate review. *See Wheatfall*, 882 S.W.2d at 836; *Nixon v. State*, 940 S.W.2d 687, 693 (Tex.App.—El Paso 1996, pet. ref'd).

### 3. Raney's Opinion of Other Witnesses' Veracity

As stated above, Curry and McGilvray testified that Raney handed them the cocaine from the door of his house. Raney's counsel asked Curry on cross-examination whether they retrieved the cocaine from Raney's house or the patrol car Raney kept at his house. Curry again testified that it came from the house. During his direct examination, Raney stated that after retrieving the evidence from the police department locker, he placed it in the trunk of his patrol car and never removed it until delivering it to Curry and McGilvray.

Counsel than asked Raney whether Curry's and McGilvray's testimony that they obtained the cocaine from Raney's house was true or false. During cross-examination, the prosecutor asked Raney point-blank whether Curry and McGilvray had lied about retrieving the cocaine from his house. Raney's counsel failed to object to this question.[9]

■■■ "It is improper [for the prosecution] to require [the accused] to express his opinion as to the truth or falsity of testimony contradicting him." *Johnson v. State*, 614 S.W.2d 148, 154 n. 17 (Tex.Crim.App. [Panel Op.] 1981) (quoting *Williams v. State*, 112 Tex.Crim. 307, 17 S.W.2d 56, 58 (1929)). However, the accused may not invite error and then complain thereof on appeal. *Thacker v. State*, 889 S.W.2d 380, 396 (Tex.

App.—Houston [14th Dist.] 1994, pet. ref'd); *Castillo v. State*, 761 S.W.2d 495, 501 (Tex. App.—Waco 1988), *aff'd*, 810 S.W.2d 180 (Tex.Crim.App.1990). When the accused offers the same evidence as that subsequently offered by the State, he cannot complain on appeal that such evidence is inadmissible. *Id.*

The questioning of Raney's own counsel preceded the prosecution's cross-examination on the same subject. Thus, Raney's counsel invited this erroneous line of inquiry. *Id.* Accordingly, Raney cannot now complain that the prosecutor engaged in improper cross-examination on this topic. *Id.*

### 4. Summary

Raney's appellate counsel has identified two situations where the prosecution engaged in misconduct. Had trial counsel objected to these two incidences on first occurrence and requested appropriate instructions, such misconduct would likely have been rendered harmless. Trial counsel's failure to object also failed to preserve these issues for appellate review. The other instance of prosecutorial misconduct identified by appellate counsel was invited by trial counsel. Thus, as a result of trial counsel's conduct, Raney cannot complain about the prosecutor's conduct in this instance as error.

Trial counsel's failure to object and his direct examination which invited the prosecution's cross-examination of Raney about the veracity of Curry and McGilvray means that error has not been properly preserved on the issue of prosecutorial misconduct. Thus, we overrule Raney's fifth and sixth points.

If trial counsel had promptly objected and requested appropriate instructions, and if trial counsel had not invited the cross-examination about Curry's and McGilvray's veracity, these matters would not have been introduced before the jury. Accordingly, we conclude that counsel did not provide "reasonably effective assistance" to Raney at trial. We sustain Raney's third and fourth points.

---

9. The prosecutor "asked" shortly thereafter, "So you say they're lying about getting this stuff out of the house. They leave about what time?" Raney responded that he did not recall the specific time they departed. Counsel failed to object to this question as well.

## CONCLUSION

Because we have sustained Raney's third and fourth points, we reverse the judgment and remand this cause for a new punishment hearing. *See* TEX.CODE CRIM.PROC.ANN. art. 44.29(b) (Vernon Supp.1998); *Ware*, 875 S.W.2d at 438.