# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 17, 2004

## STATE OF TENNESSEE v. JOHN RAMSEY DUNCAN

### Direct Appeal from the Criminal Court for Davidson County
### No. 2002-B-1062    Seth Norman, Judge

---

### No. M2003-01820-CCA-R3-CD - Filed February 1, 2005

---

Following a jury trial, Defendant, John Ramsey Duncan, was convicted of four counts of rape of a child, a Class A felony, and four counts of aggravated sexual battery, a Class B felony. After a sentencing hearing, the trial court sentenced Defendant to twenty-two years for each rape of a child conviction, and ten years for each aggravated sexual battery conviction. The trial court ordered Defendant's sentence for his rape of a child conviction in count two to run consecutively to his sentence for his rape of a child conviction in count one, and all other sentences to run concurrently to count one, for an effective sentence of forty-four years. On appeal, Defendant argues that the evidence is insufficient to support his convictions, and that the trial court erred in ruling certain out-of-court statements made by the victim to witnesses Lisa Dupree and Julie Carter as admissible. In addition, since the filing of the briefs, Defendant has also asked us to consider the impact of the ruling in *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531 (2004) on the length of his sentences and the trial court's imposition of consecutive sentencing. After a thorough review of the record, we affirm Defendant's convictions and the imposition of consecutive sentencing. We modify under *Blakely* each of Defendant's sentences for rape of a child to twenty years, and each of his sentences for aggravated sexual battery to eight years.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgments of the Criminal Court Affirmed; Sentences Modified

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and ALAN E. GLENN, JJ., joined.

David R. Heroux, Nashville, Tennessee, (on appeal) and Mike Anderson, Nashville, Tennessee, (at trial) for the appellant, John Ramsey Duncan.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, the State of Tennessee.

# OPINION

## I. Background

In February, 2002, social worker Cindy Holdsworth began counseling the Duncan family after the victim, M.W., told her school principal that Defendant, who was her stepfather, had punished her by pulling her to her feet by her hair. (The minor victim will be referred to by her initials). The family at this time consisted of nine-year-old M.W.; Delores Duncan; M.W.'s mother; John, Jr., M.W.'s baby brother; and Defendant. Ms. Holdsworth said that she initially visited the family two or three times a week. She soon became concerned for M.W.'s safety, however, and began daily visits in March. Ms. Holdsworth said that M.W. was visibly afraid of Defendant whenever she was with him, so Ms. Holdsworth began visiting the child alone at her school.

After the family began counseling sessions with Ms. Holdsworth, Ms. Duncan arranged for M.W. to go to the home of a neighbor, Julie Carter, after school until Ms. Duncan arrived home from work so that M.W. would not be alone with Defendant. M.W. and Ashley Carter, Ms. Carter's daughter, were friends. Ms. Carter said that when it was time for M.W. to go home, the child often screamed and cried. Ms. Carter asked M.W. one day if Defendant had ever touched her inappropriately. M.W. asked Ms. Carter if she could tell Ashley and then let Ashley tell her mother. The two girls left the room. When they returned, Ashley told her mother that M.W. said that "he made her lick it like a lollipop."

Ms. Carter called Ms. Holdsworth on April 2, 2002, and said that M.W. had described some incidents involving Defendant in very graphic sexual detail. Ms. Holdsworth spoke with M.W. at school the next day. Although the child was at first reluctant to speak, M.W. eventually described certain sexual acts that Defendant had made her perform. M.W. told Ms. Holdsworth that the sexual contacts started when M.W. was six or seven years old. Although Ms. Holdsworth said that M.W. did not always have a time frame for the incidents, she described the incidents in detail. M.W. said that Defendant told her he knew what he was doing was wrong, but that he was punishing her for misbehaving.

After Ms. Holdsworth talked with M.W., the child was removed from her home and sent to her maternal grandfather's house. Ms. Holdsworth said that she met with Ms. Duncan the next day to explain what was happening, and Ms. Duncan was devastated and shocked.

Holly Gallion, a nurse practitioner with Our Kids Center, testified that she reviewed the physical exam performed on M.W. on May 14, 2002. Ms. Gallion said that the examination was normal and showed no signs of physical injury, infection or trauma. Ms. Gallion said that she reviewed the information gathered by Lisa Dupree, a social worker with Our Kids Center. Ms. Gallion said that M.W.'s examination was consistent with the allegations of sexual abuse relayed to Ms. Dupree which consisted of rubbing and touching without penile penetration. Ms. Gallion admitted on cross-examination that the results of the examination were also consistent with an examination of a child who had not been sexually abused.

Lisa Dupree, a social worker with Our Kids Center, said that developmentally M.W. was "grossly average." Ms. Dupree said that the only anatomical information M.W. seemed to lack was the difference between a vaginal opening and her "private area" in general. As part of the examination, Ms. Dupree said that she always tried to ascertain what type of contact was incurred in order to assess the child's level of risk. M.W. described penile-genital, penile-rectal and penile-oral contact. M.W. said that the contacts occurred more than once and were painful. Ms. Dupree said that M.W. exhibited a good deal of anxiety over the performance of the examination.

M.W. was ten years old at the time of the trial. She testified that Defendant was sometimes home when she got home from school, and that her mother usually got home around 6:00 p.m. M.W. said that she did not know how old she was when the sexual contacts began, but they happened "a bunch." M.W. said she thought the contacts occurred during a one-year time frame in the Defendant's bedroom, the bathroom and the living room.

On one occasion, M.W. said that Defendant made her take her clothes off in the bathroom. Defendant was also nude. Defendant then made M.W. get on her knees and touch his "private" with her hand and "go up and down." Defendant made her lie down on her back and then licked her on what she described as the "bottom part of my front."

In a second incident, Defendant made M.W. put on a special outfit without any underwear when she got home from school. He told her to sit down on the floor in the living room and pull her skirt up. Defendant then took a photograph of M.W. with his camera. Defendant also took a photograph of his penis in M.W.'s mouth. Defendant told M.W. that if she told anyone, he would send the photographs to everybody at her school. During a third incident, Defendant performed oral sex on M.W. in the bathroom.

M.W. said Defendant worked at the Stage One Video. There were also tanning booths inside the store. During one incident, Defendant made M.W. perform oral sex on him in one of the tanning booths. M.W. said she was nine-years-old when that incident occurred.

M.W. said that on another occasion, Defendant made her masturbate him in his bedroom, and made her lick between the cheeks of his buttocks while they were in the living room. Another incident involved M.W. bending over in the bathroom while Defendant rubbed his penis on her buttocks.

M.W. said that "milk water" would come out of Defendant's penis during some of the contacts. She said that the contacts happened numerous times and listed the locations for the various acts. M.W. said she told Defendant to stop once, but he continued the contacts. M.W. said that the contacts occurred while her mother was at work. Although M.W. had shared a bedroom with her older brother, Corey, he had moved out before the incidents began. M.W. accurately identified the body parts involved in the contacts with Defendant on anatomically correct male and female dolls.

On cross-examination, M.W. said that she did not stay home alone with Corey because he was either working or with friends during the day. M.W. said that she went to day care during summer vacation. M.W. said she was mad when Defendant made Corey move out. M.W. said that both her mother and Defendant disciplined her by either grounding her or refusing to let her watch television. M.W. said that she did not know how to use the internet, but she watched the news on television and was familiar with the recent stories concerning pedophile charges against Catholic priests. M.W. said that she had talked to a number of people about the incidents, and everyone was nice to her.

Ms. Duncan said that she usually got home from work around 5:30 p.m. Defendant worked during the day at a grocery store and was usually home between 3:00 and 4:00. In the evenings or on weekends, he worked at the video store. When M.W. was in the first and second grades, she went to a daycare center after school. Then Defendant's schedule allowed him to be home in the afternoon, and M.W. started walking home from school. She was usually home by 3:15 p.m. John, Jr., stayed at a day care center, and Defendant usually picked him up around 5:00 or 5:30 p.m.

Ms. Duncan said that she did not think M.W. had ever accessed the internet through their home computer. Ms. Duncan said that other than a few general questions about boys, she and M.W. had never discussed any topics concerning sex.

Ms. Duncan said that she first learned about the allegations on a Wednesday night in April, 2002, when a social worker came to her house. She discussed matters further with Ms. Holdsworth on Thursday morning. As a result of these conversations, Ms. Duncan sent M.W. to her maternal grandfather's house on Thursday and Friday nights. On Saturday night, Ms. Duncan moved out of the apartment.

Ms. Duncan said that Defendant had bought her a digital camera for her birthday in September, 2001. Ms. Duncan did not know how to operate the camera, but Defendant frequently took photographs of the children and downloaded the film onto the computer. Ms. Duncan said she returned to the house a few days after she moved out to retrieve some clothes for the baby. She turned on the computer to download some information she needed and discovered that the tower encasing the computer's hard drive was missing. Defendant told her he did not know what happened to the tower but did not file a police report to report the stolen computer. Nothing else was missing from the apartment.

Ms. Duncan said that Ms. Holdsworth told her not to probe M.W. for information about the incidents but let the child tell her about the allegations on her own. Ms. Duncan said that she still did not know everything that M.W. told the social workers.

On cross-examination, Ms. Duncan said that she did not have any concerns over M.W. sharing a bedroom with her older son while Corey lived at home. Ms. Duncan said that Corey babysat M.W. during the summer of 2000, but that M.W. was at home alone during the summers of 2001 and 2002. Ms. Duncan admitted that the family had experienced financial difficulties over the

past few years, and that Defendant had threatened to leave her and take John, Jr. Ms. Duncan said that Defendant was the main disciplinarian in the family, but she would sometimes counteract his punishment if she thought she needed to.

Defendant testified on his own behalf. He agreed with Ms. Duncan's assessment that he was the family's disciplinarian, and admitted that there may have been times when his punishment was too harsh. Defendant remembered that he told M.W. one time that if she did not behave, he would send her to "juvenile."

Defendant said that it was not necessary to know a password before connecting to the internet on the home computer, and that one simply had to push the "connect" button. Defendant said that he discovered a pornographic magazine on top of the dresser in Corey's and M.W.'s bedroom. He found other magazines when he searched the room further. Defendant said that M.W. would often leave the house without telling anyone where she was going. Defendant said that Ms. Holdsworth became involved with the family when M.W. told her school's principal around February 15, 2002, that Defendant had picked her up by her hair while he was punishing her. Defendant denied that he had ever sexually abused M.W.

On cross-examination, Defendant said that he may have spanked M.W. once or twice, and that he also may have slapped her across the face "a couple of times." Defendant explained, however, that he had a good relationship with M.W. until "the hair-pulling incident." Defendant admitted that M.W. did not seem to be comfortable around him after that and began going to Ms. Carter's house after school.

Defendant said that it was possible that his wife encouraged M.W. to accuse him of sexual abuse. Defendant said that M.W. received a lot of attention after she reported that Defendant had pulled her hair, and received a lot more attention after she accused him of sexual abuse. Defendant admitted that he did not initially tell the police about his suspicions that M.W. may have learned about various sexual acts from the internet or pornographic magazines. He also admitted that he found the pornographic magazines about two and one-half years before the sexual allegations. Defendant said that M.W. had spent one summer alone with Corey.

## II. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to support his convictions for rape of a child and aggravated sexual battery. His argument, however, is directed mainly toward the credibility of M.W.'s testimony which Defendant contends was undermined by certain inconsistencies in her testimony.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a

defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this Court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

To establish rape of a child, the State was required to prove "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen years of age." Tenn. Code Ann. § 39-13-522(a). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . ." *Id.* § 39-13-501(7).

To establish aggravated sexual battery, the State was required to prove "unlawful sexual contact with a victim by the defendant," when the victim is less than thirteen years old. *Id.* § 39-13-504(a)(4). "Sexual contact" is "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id*. § 39-13-501(6). "'Intimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

For the rape of a child convictions, the State elected the following offenses. Count one alleged that Defendant made M.W. fellate him in Defendant's bedroom while the victim was lying on the bed. Count two alleged that Defendant made M.W. fellate him in the living room of the victim's apartment while Defendant photographed the victim with a digital camera. Count three alleged that Defendant performed cunnilingus on the victim while she was on the floor in the bathroom. Count four alleged that Defendant made M.W. fellate him in the tanning booth at his place of employment.

For the aggravated sexual battery convictions, the State elected the following offenses. Count five alleged that Defendant made the victim masturbate him in Defendant's bedroom. Count six alleged that Defendant made M.W. lick between his buttock cheeks. Count seven alleged that Defendant rubbed his penis against M.W.'s buttocks while she bent over in the apartment's bathroom. Count eight alleged that Defendant rubbed his penis against M.W.'s genitals while she was lying on Defendant's bed.

M.W.'s testimony about each of the charged offenses was clear and concise. She described the acts involved and where the acts occurred. M.W. correctly identified the various areas of contact between her and Defendant on anatomically correct dolls. Issues concerning M.W.'s credibility, caused by her inability to remember her exact age when some of the incidents occurred, or whether she had spent summer vacation in the care of her older brother, were placed before the jury, and it was the jury's prerogative to accredit or discredit the victim's testimony.

M.W. said that the Defendant committed the sexual acts to punish her. She said that Defendant told her that if she said anything, he would show the photographs of her performing fellatio on him to her schoolmates and teachers. M.W. testified that the incidents embarrassed her and made her angry that he was making her perform the acts. M.W. described to Ms. Dupree, penile-rectal, penile-oral, and penile-genital contact with Defendant, and said that these contacts happened more than one time and were painful. M.W. also described to Ms. Carter and Ms. Holdsworth the act of fellatio and similar incidents.

Based upon our review of the record, we conclude that the evidence was sufficient to support Defendant's four convictions of rape of a child and four convictions of aggravated sexual battery.

### III. Admissibility of Victim's Out-of-Court Statements

Defendant first challenges the admissibility of the statements M.W. made to Ms. Dupree about Defendant's sexual conduct. The trial court concluded that the statements were admissible under the "diagnosis and treatment" exception to the hearsay rule found in Rule 803(4) of the Tennessee Rules of Evidence. Defendant argues that Ms. Dupree was a non-medical professional, and, accordingly, any statements made to her by M.W. were for the purpose of evaluation, and not diagnosis and treatment as required by Rule 803(4). Relying on *State v. Stinnett*, 958 S.W.2d 867 (Tenn. 1996), Defendant also contends that the trial court erred in not conducting a hearing outside the presence of the jury prior to finding the statements admissible.

Ms. Dupree testified that she was a social worker with Our Kids Center and had a bachelor's degree in social work, and masters' degrees in counseling and social work. She said that the purpose of the facility was to perform medical evaluations of children who are the alleged victims of sexual assault in order to assess the presence of any injuries and meet the child's diagnostic and treatment needs. Ms. Dupree explained that it was her role as part of the team assigned to a particular case to gather information about the child's current situation, education, development and overall health. Ms. Dupree must explain the medical examination to the child and tell the child that the purpose of gathering information was to assist the clinic in determining if the child has any infections or diseases. Ms. Dupree said that it was necessary to determine the type of sexual contact the child may have had in order to know whether specific blood cultures were necessary and to assess the child's risk for infection. It was also necessary to determine when the alleged contact occurred in order to properly schedule the appropriate tests. Ms. Dupree said that she also discussed human anatomy with the child in order to understand what the child was saying and to assess the child's level of development. Ms. Dupree said that she tells a child during the interview that the child must be

accurate about his or her response so that she could make sure the child is healthy. Ms. Dupree conceded on cross-examination that her reports are sometimes used in legal proceedings. Ms. Dupree said that Our Kids Center is an out-patient clinic associated with Metro General Hospital. The reports generated by Our Kids Center are forwarded directly to General Hospital for maintenance.

During the interview with Ms. Dupree, M.W. indicated she understood that the purpose of the examination was to show whether "[Defendant] gave me an infection in my private." At this point, Defendant objected to Ms. Dupree testifying as to any other statements the victim made during the interview concerning the alleged sexual contact with Defendant. Without holding an evidentiary hearing, the trial court found the victim's statements to Ms. Dupree admissible pursuant to Rule 803(4) based on Ms. Dupree's testimony to that point.

An exception to the rule prohibiting hearsay testimony encompasses statements made during a medical interview as set forth in Rule 803(4) of the Tennessee Rule of Evidence:

> Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.

The rationale for the medical diagnosis and treatment hearsay exception is that such declarations are deemed reliable because the declarant is motivated to tell the truth for the ultimate purpose of receiving proper diagnosis and treatment. "Moreover, if physicians and other medical personnel rely upon the statement in diagnosing and treating the patient, then the statement should be sufficiently trustworthy to be admissible in a court of law." *State v. McLeod*, 937 S.W.2d 867, 870 (Tenn. 1996). The *McLeod* court also acknowledged that the rationale supporting the admission of such statements becomes questionable when the declarant is a child who may not be able to understand the need for truthfulness in such a situation. *Id.* As a result, the court cautioned that "the admissibility decision should be based upon a thorough examination of all of the circumstances surrounding the statement" including "the timing of the statement and its contents . . . whether the child's statement was in response to suggestive or leading questions; and/or . . . any other factor that may affect trustworthiness, such as a bitter custody battle or family feud." *Id.* at 871. The court also determined that the proper venue for presenting the evidence that is relevant to the making of the declarant's statement is an evidentiary hearing outside the presence of the jury. *Id.* at 869.

"The focus [of Rule 803(4) is] not so much upon who received the statements as to why they were given." *State v. Hunter*, 926 S.W.2d 744, 747 (Tenn. Crim. App. 1995). Although Rule 803(4) is generally implicated when statements are made to a physician, "the exception encompasses statements made to anyone, such as medical professionals, nurses, or any other health care attendants, *provided* the statement is made for the purpose of diagnosis and treatment." *State v. Williams*, 920 S.W.2d 247, 256 (Tenn. Crim. App. 1995) (emphasis in original); *see also State v. Gordon*, 952 S.W.2d 817 (Tenn. 1997)(statements made to psychologist employed by Our Kids

Center and relied upon by medical personnel for diagnosis and treatment of the victim admissible under Rule 803(4)).

"It is well established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *McLeod*, 837 S.W.2d at 871 (citations omitted.). Although the trial court in the case *sub judice* did not hold the requisite jury-out hearing, Ms. Dupree testified in detail, without objection by Defendant, about the function of the Center, her role on the examination team, the procedures utilized when a case is first opened, and the circumstances under which M.W.'s statements were made. Ms. Dupree explained the steps taken to prepare M.W. for a physical examination, including familiarizing M.W. with the equipment that would be used. Ms. Dupree also testified that she explained to M.W. why she was being examined, and M.W. indicated that she understood that the examination was to find out if she had any injuries or infections. The purpose of an evidentiary hearing in the case of a child declarant is to ascertain if the child understands the need for truthfulness in a medical setting. *Id.* at 870. Based upon our review of the record, we conclude that the evidence sufficiently reflects that M.W.'s statements to Ms. Dupree were made for the purpose of diagnosis and treatment, that Ms. Dupree's questions were not suggestive or leading, and that M.W. comprehended the need for truthfulness during her examination. The trial court did not err in admitting the statements into evidence.

### V. Admissibility of Victim's Statements to Julie Carter

Defendant argues that the trial court erred in ruling the victim's out-of-court statements to Julie Carter admissible under the "excited utterances" exception to the hearsay rule set forth in Rule 803(2) of the Tennessee Rules of Evidence. Defendant contends that M.W.'s conversation with her neighbor was not in response to a startling event, and there is no evidence that M.W. was in a state of stress or excitement from a startling event when she made the statements. In addition, Defendant argues that Ms. Carter's testimony concerning what her daughter, Ashley, said that M.W. told her constituted hearsay within hearsay beyond the reach of Rule 803(2). The State contends that Defendant waived any issues on appeal concerning Ms. Carter's testimony about the sexual contacts described by M.W. and Ashley because he objected only to Ms. Carter's testimony concerning M.W.'s statements about physical contact. *See* Tenn. R. App. P. 36(a).

At trial, the following exchange occurred:

| [STATE]: | Would you describe what happened on that specific day when that questioning took place. |
|---|---|
| [MS. CARTER]: | [M.W.] had been coming to my house for quite a while during spring break, a couple of mornings at 6:30 in the morning when her mom would go to work. She would come running down there just banging on the door. And one afternoon I was sitting there waiting for [Ms. Duncan] to get home. And I asked, |

|  |  |
|---|---|
|  | [M.W.] has your stepfather, has he touched you in any appropriate [sic] manner, and she told me every time he punches me – |
| [DEFENSE COUNSEL]: | Your Honor, I'm going to object to the hearsay. |
| [STATE]: | Your Honor, offered as an excited utterance, Your Honor. |
| [THE COURT]: | I'll overrule it. |
| [MS. CARTER]: | Every time he punches me, it's inappropriate. And I said well I'm talking about in a more inappropriate manner. And she got real quiet and she said, can I tell Ashley and let Ashley tell you, which is my daughter. And I said, that's fine. So they left the room and my daughter said mom, [M.W.] said that – |
| [DEFENSE COUNSEL]: | I'm going to object to the hearsay again, Your Honor. |
| [STATE]: | I'll clarify that. When [M.W.] came back, was it with Ashley? |
| [MS. CARTER]: | Yes. |
| [STATE]: | Was [M.W.] present in the room when Ashley was making the statement? |
| [MS. CARTER]: | Yes. |
| [STATE]: | All right. Would you indicate what Ashley said [was] M.W.'s response? |
| [MS. CARTER]: | Mom, he makes her lick it like a lolly pop [sic]. |

Ms. Carter said that she sent her daughter out of the room to do her homework and told M.W. it was okay to tell her about the incidents. Ms. Carter said that M.W. grew "real quiet and started fooling with her hair." After M.W. described how Defendant made her masturbate him, Ms. Carter stopped questioning the victim. During their conversation, Ms. Carter said that M.W. sat "as far into the corner of my couch [as] she could get, that's when she kind of got real, real quiet, embarrassed. Almost ashamed of what had happened."

-10-

Defendant objected to Ms. Carter's testimony as soon as she began to recount what M.W. told her in response to Ms. Carter's questions about inappropriate touches. The trial court ruled that M.W's statements to Ms. Carter qualified as excited utterances. Defendant was not required to object to each of the victim's out-of-court statements which the State offered under the umbrella of Rule 803(2) through Ms. Carter's testimony. Defendant also entered a prompt objection as soon as Ms. Carter began to testify about what Ashley had learned from M.W. Defendant properly preserved for appeal issues concerning the admissibility of M.W.'s out-of-court statements to Ms. Carter.

Rule 803(2) extends an exception to the hearsay rule to statements made by a declarant "relating to a startling event or condition . . . while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). The rationale behind permitting such statements is two-fold:

> First, since this exception applies to statements where it is likely there was a lack of reflection–and potential fabrication–by a declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity . . . . Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it.

*State v. Gordon*, 952 S.W.2d 817, 819-20 (Tenn. 1997) (quoting Cohen, Paine & Sheppeard, *Tennessee Law of Evidence* § 803(2).1 at 532 (3d ed. 1995)).

Thus, three events must be present in order for an out-of-court statement to be considered an excited utterance. First, there must be a startling event which prompts the statement. Although the startling event is usually the incident that is the basis of the legal controversy, the exception is not limited to statements made only in the immediate aftermath of the offense. *Gordon*, 952 S.W.2d at 820. "[R]ather, a subsequent startling event or condition which is related to the prior event can produce an excited utterance." *Id.* (The victim's painful urination triggered the startling event, not the rape itself.)

The second requirement that the statement relate to the startling event is very broadly construed by our courts. The statement may describe all or part of the event or the impact of the event on the declarant. *Id.* Finally, the statement must be made while the declarant is under stress or excitement from the startling event. "The ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993).

Ms. Carter testified that M.W. would sometimes cry and scream when it was time to go home, or come running up to her house, banging on the door, after her mother left for work. There is no indication, however, that M.W. was exhibiting any of these emotional signs on the afternoon

she told Ms. Carter about Defendant's conduct. Ms. Carter said that her conversation with M.W. occurred while they sat in the living room waiting for Ms. Duncan to pick up M.W.

The State argues, however, that the startling event which prompted M.W.'s comments to Ms. Carter was Defendant's conduct over the past months, and that M.W. continued to experience stress and excitement as a result of the conduct. There is no doubt that the rape of a child is a startling event. *State v. Rucker*, 847 S.W.2d 512, 517 (Tenn. Crim. App. 1992); *State v. Person*, 781 S.W.2d 868, 872 (Tenn. Crim. App. 1989). The declarant's statements, however, must "spring out of the transaction" while the declarant is still suffering stress or excitement from the event. *Smith*, 857 S.W.2d at 9.

A lapse of time between the startling event and the declarant's statement does not necessarily preclude a finding that the statement was a spontaneous response to the event, or that the declarant's stress or excitement had not diminished. *See State v. Binion*, 947 S.W.2d 867 (Tenn. Crim. App. 1996) (Victim's statements to two of her friends that were made thirty to forty-five minute after the attempted rape were admissible as excited utterances where evidence supported a finding that the victim continued to exhibit the stress and excitement of the event).

In *State v. Stout*, 46 S.W.3d 689 (Tenn. 2001), the court acknowledged that the twelve-hour lapse of time between the killing and the declarant's statements presented a close question as to admissibility. Despite the fact that the twelve-hour period provided ample time for the declarant/accomplice "to reflect and deliberate before making his statements," the trial court specifically found that the declarant continued to be under the stress of the events the night before. *Id.* at 700. Because the trial court had considered all of the relevant factors, including the time span between the event and the statement, the court concluded that the trial court did not err in admitting the declarant's statements as excited utterances. *Id.* at 700-01.

"Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress." *Id.* (quoting *Tennessee Law of Evidence*, § 803(2).2, at 534).

There is no doubt that M.W. continued to experience stress, embarrassment and dismay over what had happened to her. In the present case, however, there is no evidence as to when Defendant's last improper act, either physical or sexual, had occurred in relation to M.W.'s conversation with Ms. Carter, or that any specific act had recently occurred that prompted M.W.'s confidences that afternoon. Instead, M.W. was in a safe spot, however temporary, and waiting for her mother to pick her up. Based on the particular circumstances surrounding the making of M.W.'s statements, we cannot conclude that M.W.'s statements were admissible under the excited utterance exception to the hearsay rule.

We also agree with Defendant's observation that Ms. Carter's testimony involved multiple layers of hearsay. The second layer of hearsay occurred when Ms. Carter repeated what her daughter

said M.W. told her about Defendant's conduct. Hearsay within hearsay is excluded unless each of the statements falls within an exception to the hearsay rule. Tenn. R. Evid. 805. We cannot conclude from the circumstances surrounding M.W.'s conversation with Ashley that either M.W.'s statements to Ashley or Ashley's statements to her mother are admissible under Rule 803(2) as excited utterances.

We do not review Ms. Carter's testimony about M.W.'s statements in light of the confrontation clause analysis outlined in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), because that issue was not raised, and we are unable to find plain error.

We conclude that the trial court's erroneous admission of M.W.'s statements as excited utterances was harmless error in this case. An error will not be grounds for reversal unless it affirmatively appears to have affected the result of the trial on the merits. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). The substance of M.W.'s descriptions to Ms. Carter of Defendant's sexual conduct was in large part cumulative to her testimony at trial. Ms. Dupree and Ms. Holdsworth both testified that M.W. confided that Defendant had engaged in certain conduct similar to that described to Ms. Carter. Based on the circumstances presented in this case, admission of M.W.'s out-of-court statements through Ms. Carter's testimony was harmless.

## VI. Sentencing Issues

Defendant did not initially raise any issues in his motion for new trial or on appeal concerning the length or manner of service of his sentences. After the parties filed their briefs in this matter, however, Defendant asked this court to consider the impact of the ruling in *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531 (2004), on the trial court's sentencing determinations. The State initially argues that Defendant has waived any sentencing issues under *Blakely* by the failure to raise his issues in the trial court. The State contends that these sentencing issues may not be addressed as plain error because the *Blakely* court merely clarified the existing rule set forth in *Apprendi*. This Court, however, has recently rejected these same arguments and concluded that a defendant may raise a *Blakely* issue while his or her direct appeal is still pending. *State v. Chester Wayne Walters*, M2003-03019-CCA-R3-CD, slip op. at 19; *State v. Earice Roberts*, W2003-02668-CCA-R3-CD, 2004 WL 2715316, at *11 (Tenn. Crim. App., Jackson, Nov. 23, 2004); *State v. Charles Benson*, No. M2003-02127-CCA-R3-CD, 2004 WL 2266801, at *8 (Tenn. Crim. App., Nashville, Oct. 8, 2004).

At the conclusion of the sentencing hearing, the trial court found two applicable enhancement factors. That is, Defendant allowed the victim to be treated with exceptional cruelty during the commission of the offenses, and the offenses involved a victim and was committed to gratify Defendant's desire for pleasure or excitement. *See* Tenn. Code Ann. § 40-35-114(6) and (8). The trial court did not find the presence of any mitigating factors. Based on the presence of two enhancement factors and no mitigating factors, the trial court sentenced Defendant to twenty-two years for each rape conviction and ten years for each aggravated sexual battery conviction. The trial court ordered Defendant's sentences for his rape of a child convictions in count one and count two

to run consecutively, with all other sentences running concurrently with count one. The trial court's sentencing determination as to consecutive sentencing was based on consideration of the aggravating circumstances arising from Defendant's relationship with the victim, the nature and scope of the sexual acts, the extent of the residual, physical or mental damage to the victim, and, especially, the time span of Defendant's undetected sexual activity. *Id.* § 40-35-115(b)(5).

As a Range I offender convicted of a Class A felony, Defendant is subject to a sentence of between fifteen and twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint of the range if there are no enhancement or mitigating factors. *Id.* § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the midpoint, but still within the range. *Id.* 40-35-201(d). If both enhancing and mitigating factors are present, the trial court must start at the midpoint of the range, enhance the sentence within the range as appropriate for the enhancing factors, and then reduce the sentence as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e).

As a Range I offender convicted of a Class B felony, Defendant is subject to a sentence of between eight and twelve years. Tenn. Code Ann. § 40-35-112(a)(2). In calculating the sentence for a Class B felony conviction, the presumptive sentence is the minimum sentence if there are no enhancement or mitigating factors. *Id.* § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum sentence, but still within the range. *Id.* 40-35-201(d). If both enhancing and mitigating factors are present, the trial court must start at the minimum sentence, enhance the sentence within the range as appropriate for the enhancing factors, and then reduce the sentence as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e).

In *Blakely*, the United States Supreme Court concluded that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Blakely*, 124 S. Ct. at 2536 (*quoting Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 147 L. Ed. 2d 435 (2000)).

Prior to *Blakely*, the *Apprendi* court had observed "that nothing in [the] history [of the common law] suggests that it is impermissible for judges to exercise discretion–taking into consideration various factors relating both to offense and offender–in imposing a judgment *within the range* prescribed by statute." *Apprendi*, 530 U.S. at 481, 120 S. Ct. at 2358 (emphasis in original). *See also Ring v. Arizona*, 536 U.S. 584, 602, 122 S. Ct. 2428, 2439, 153 L. Ed. 2d 556 (2002) ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact–no matter how the State labels it–must be found by a jury beyond a reasonable doubt.")

The *Blakely* court, however, clarified that the relevant "statutory maximum" which forms the basis of the *Apprendi* rule "is not the maximum sentence a judge may impose after finding additional

facts, but the maximum he may impose *without* any additional findings." *Blakely*, 124 S. Ct. at 2537. *Blakely*, however, does not preclude a sentencing court's consideration of the defendant's prior convictions as an enhancement factor in determining the length of the defendant's sentence. *Id.* at 2536. As the *Apprendi* court observed, prior convictions do not relate to the commission of the offense for which the defendant is being sentenced, and presumably the prior convictions "had been entered pursuant to proceedings with substantial safeguards of their own." *Apprendi*, 530 U.S. at 488, 120 S. Ct. at 2361-62.

At Defendant's sentencing hearing, Walter Williams, M.W.'s maternal grandfather, said that he had been called to M.W.'s school one day to pick up his granddaughter. Mr. Williams said that M.W. was scared to go home because Defendant was alone at the house. On another occasion, he found his granddaughter by herself on the playground. M.W. told him that Defendant had come home, found M.W. alone in the house, and ordered her to go to the playground until her mother came home. Mr. Williams noticed bruises on M.W.'s neck and arms one day. M.W. said that Defendant had grabbed her and thrown her against a wall as a punishment. Mr. Williams said that M.W. was terrified of Defendant.

Paulette Duncan, Defendant's mother, testified that Defendant had served in the military for approximately five years and had been honorably discharged. Ms. Duncan said that Defendant was always employed and sometimes worked two jobs to support his family.

Although a victim's statement and the presentence report were introduced as exhibits during the sentencing hearing, these documents were not included in the record on appeal.

A. Length of Sentences

We note that the trial court did not place its reasons for arriving at its final sentencing decisions on the record. *See State v. Jones*, 883 S.W.2d 597, 599 (Tenn. 1994)("[T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence."). The trial court, however, found that enhancement factors (6) and (8) were applicable to each of Defendant's sentences for rape of a child and aggravated sexual battery. The trial court sentenced Defendant to twenty-two years for each of his rape of a child convictions, or two years over the presumptive sentence of twenty years for a Range I, standard offender convicted of a Class A felony. The trial court sentenced Defendant to ten years for each of his aggravated sexual battery convictions, or two years over the presumptive sentence of eight years for a Range I, standard offender convicted of a Class B felony.

*Blakely* issues notwithstanding, we note first that the trial court misapplied enhancement factor (8) to Defendant's convictions for aggravated sexual battery. The Supreme Court has previously concluded that enhancement factor (8), the offense was committed for the defendant's desire for pleasure or excitement, is an essential element of the offense of aggravated sexual battery

and may not, therefore, be used to enhance the defendant's sentence for that offense. *State v. Kissinger*, 922 S.W.2d 482, 489 (Tenn. 1996).

Turning to the application of enhancement factor (8) to Defendant's rape of a child convictions within the context of *Blakely*, the State argues that a jury, having found Defendant guilty of aggravated sexual battery, would have found beyond a reasonable doubt that the rape of a child offenses were committed for Defendant's desire for pleasure or excitement if it had been given the opportunity to do so. We respectfully reject the State's argument. To hold that a jury's finding of guilt on one offense means by implication that the jury also found the existence of a sentencing enhancement factor on another offense calls into question the continued viability of the long-standing precedent that each count of an indictment is regarded as a separate offense. *See Wiggins v. State*, 498 S.W.2d 92 (Tenn. 1973); *State v. Stanley Craig Hughes*, No. E2004-00105-CCA-R3-CD, 2004 WL 2138335 (Tenn. Crim. App., at Knoxville, Sept. 24, 2004) *perm. to appeal denied* (Tenn., Dec. 28, 2004); *State v. James A. McCurry*, No. W2002-02870-CCA-R3-CD, 2003 WL 22848975 (Tenn. Crim. App., at Jackson, Nov. 26, 2003), *perm. to appeal denied* (Tenn., May 10, 2004); *State v. Jason R. Garner*, No. W1999-01679-CCA-R3-CD, 2003 WL 1193253 (Tenn. Crim. App., at Jackson, Mar. 14, 2003) *perm. to app. denied* (Tenn., Oct. 6, 2003).

We acknowledge that a panel of this Court recently concluded that the trial court's application of enhancement factor (8) to the defendant's convictions for rape of a child did not violate *Blakely* under the facts presented in the case. *State v. Chester Wayne Walters*, No. M2003-03019-CCA-R3-CD, 2004 WL 2246196, at *22 (Tenn. Crim. App., at Nashville, Nov. 30, 2004).

In *Walters*, the defendant was charged with one count of rape of a child and one count of aggravated sexual battery for one incident and one count of rape of a child and one count of aggravated sexual battery for a second incident. The jury convicted the defendant of all four counts. A panel of this Court concluded that separate convictions for rape of a child and aggravated sexual battery arising out of each incident violated double jeopardy provisions and merged each aggravated sexual battery conviction into the corresponding rape of a child conviction. The court further concluded that enhancement factor (8) was properly applied to the defendant's rape convictions because the jury, in finding the defendant guilty of aggravated sexual battery, necessarily concluded that the offenses of rape were also committed for the purpose of Defendant's sexual arousal or gratification. *Id*. at *22.

Because the aggravated sexual battery convictions were merged into the rape of a child convictions, however, the factual scenario presented in *Walters* is distinguishable from the situation presently before us. In the case *sub judice*, the State wants us to accept that the jury finding of an element of one crime for a particular offense also shows that the jury found that the same fact applied to a different crime pertaining to a different, unrelated offense.

"Courts have always resisted inquiring into a jury's thought processes." *United States v. Powell*, 469 U.S. 57, 67, 105 S. Ct. 471, 477, 83 L. Ed. 2d 461 (1984). This resistance is perhaps best illustrated in the cases involving a defendant's challenge to the consistency of a jury's verdicts

in a multi-count indictment. Beginning most notably with *Wiggins*, this Court has consistently declined to disturb one conviction on the basis that the jury's acquittal on another offense is inconsistent, even when the elements and evidence of the two offenses intertwine or are the same. *See State v. Derek T. Payne*, No. W2001-00532-CCA-R3-CD, 2002 WL 31624813 (Tenn. Crim. App., at Jackson, Nov. 20, 2002), *perm. to appeal denied* (Tenn. May 9, 2003)(conviction of second degree murder as a lesser included offense of felony murder upheld even when convicted of underlying felony).

In *State v. Tony Scott Walker*, No. 02C01-9704-CC-00147, 1997 WL 746433 (Tenn. Crim. App., at Jackson, Dec. 3, 1997), *perm. to app. denied* (Tenn. Sept. 21, 1998), for example, the defendant was convicted of first degree felony murder, but was acquitted of the underlying felony of especially aggravated robbery. Despite the inconsistencies presented by the two verdicts, this Court upheld the defendant's conviction for felony murder under the principles set forth in *Wiggins* and *Powell*. *Id*. 1997 WL 746433, at *5. In so doing, this Court observed that "any attempt to separate a verdict that may be the product of an error that worked against one of the parties would be based on pure speculation or would involve inappropriate inquiry into the jury's deliberation." *Id*. at *4 (citing *Powell*, 469 U.S. at 66, 105 S. Ct. at 477). Thus, this Court's only inquiry when presented with inconsistent verdicts is the sufficiency of the evidence of the convicted offense. *Id*. at *5; *see Wiggins*, 498 S.W.2d at 93.

In *Dunn v. United States*, 284 U.S. 390, 52 S. Ct. 189, 76 L. Ed. 2d 356 (1932), the defendant was found guilty of maintaining a common nuisance by keeping intoxicating liquor for sale at a specified place, but acquitted of the offenses of possession and sale of intoxicating liquors, even though the evidence was the same for all counts. The defendant challenged the inconsistency of the verdicts, arguing that the jury's finding that he did not unlawfully sell or possess liquor necessarily negated a finding that he committed the nuisance offense. In upholding the defendant's nuisance conviction, the Supreme Court observed that:

> [t]he most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right exercise, but to which they were disposed through lenity.

*Id.*, 284 U.S. at 393, 52 S. Ct. at 190 (citation omitted). The court declined to disturb the defendant's nuisance conviction, observing that "[e]ach count in an indictment is regarded as if it was a separate indictment." *Id*. (citation omitted).

The *Dunn* rule continues to rest "on a sound rationale" that reflects a "recognition of the jury's historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the executive government." *Powell*, 469 U.S. at 65, 105 S. Ct. at 477. The *Powell* court rejected, "as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts" in the event the inconsistency worked to their disadvantage. *Id*. at 67, 105 S.

Ct. at 477. "Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *Id.* Although jurors are charged to follow the law as instructed, once the evidence is presented and the case submitted to the jurors, "the litigants must accept the jury's collective judgment." *Id.*

Based on this analysis, we cannot adopt the view that the use of a jury's verdict on one offense to support a finding of a sentencing enhancement factor on another separate offense satisfies the *Blakely* rule that a jury must find the existence of each element of each offense, whether labeled an element or an enhancement factor, beyond a reasonable doubt. This view invites the very type of speculation the *Powell* court sought to prevent. *See also Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078 (1993) . . . ("The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action . . .; it requires an actual jury finding of guilty.").

*Blakely* reflects the *Powell* court's observation that the jury is the final arbiter of each element of each offense. *Blakely*, 124 S. Ct. at 2543. "[E]very defendant has the *right* to insist that the prosecutor prove to a jury all facts legally essential to punishment." *Id.* As the *Blakely* court stated:

> [The Sixth Amendment right to a jury trial] is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary.

*Id.* at 2538.

Accordingly, notwithstanding the jury's verdicts of guilty on the charges of aggravated sexual battery in the case *sub judice*, we conclude that *Blakely* precludes application of enhancement factor (8) to increase the length of Defendant's sentences for his rape of a child convictions. Similarly, we also find that application of enhancement factor (6) was improperly applied to Defendant's sentences for both his aggravated sexual battery convictions and his rape of a child convictions under *Blakely*. Because there is no evidence that Defendant has any prior convictions, we reduce each of Defendant's sentences for his aggravated sexual battery convictions to the statutory presumptive sentence of eight years, and each of Defendant's sentences for his rape of a child convictions to the statutory presumptive sentence of twenty years.

B. Consecutive Sentencing

Defendant does not challenge the trial court's findings that led it to conclude that consecutive sentencing was appropriate under Tennessee Code Annotated section 40-35-115(b)(5). The only issue pertaining to consecutive sentencing that Defendant raises on appeal is whether the imposition of consecutive sentencing violates *Blakely*. Other than a finding that he has been convicted of multiple sexual offenses, Defendant submits that the statutory considerations that may support

consecutive sentencing must be found by a jury beyond a reasonable doubt under *Blakely*. *See* Tenn. Code Ann. § 40-35-115.

The trial court ordered Defendant's sentence for his rape of a child conviction in count two to run consecutively to his sentence for his rape of a child conviction in count one. The trial court ordered the remainder of his sentences to run concurrently. The trial court based its imposition of consecutive sentencing on Tennessee Code Annotated section 40-35-115(b)(5) which is applicable when a defendant is convicted of two or more statutory offenses involving the sexual abuse of a minor. In determining whether this factor is applicable a trial court must consider the aggravating circumstances arising from the defendant's relationship with the victim, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts, and the extent of the residual, physical and mental damage to the victim. Tenn. Code Ann. § 40-35-115(b)(5).

A panel of this Court has previously concluded that *Apprendi* does not preclude a trial court from determining whether a defendant's multiple sentences should be served concurrently or consecutively. *State v. Ira Ishmael Muhammed*, No. E2003-01629-CCA-R3-CD, 2004 WL 1073889 (Tenn. Crim. App., Knoxville, May 10, 2004). Moreover, Defendant's argument that *Blakely* affects the trial court's authority to impose consecutive sentences for multiple offenders has recently been rejected by this Court. *State v. Lawrence Warren Pierce*, No. M2003-01924-CCA-R3-CD, 2004 WL 2533794, at *13 (Tenn. Crim. App., Nashville, Nov. 9, 2004); *State v. Michael L. Wallace*, No. E2003-01719-CCA-R3-CD, 2004 WL 2671619, at *7 (Tenn. Crim. App., Knoxville, Nov. 23, 2004). *See also State v. Gregory Robinson*, 146 S.W.3d 469, 499 n.14 (Tenn. 2004) (citations omitted) ("[S]everal courts have rejected [this] contention and held that *Blakely* and *Apprendi* do not apply to the decision to impose consecutive sentences.").

We conclude, therefore, that *Blakely* and *Apprendi* do not affect the trial court's imposition of consecutive sentences in the case *sub judice*.

## CONCLUSION

Following a thorough review of the record, we affirm Defendant's convictions for rape of a child and aggravated sexual battery. We affirm the trial court's imposition of consecutive sentencing. We modify under *Blakely* each of Defendant's sentences for rape of a child to twenty years, and each of his sentences for aggravated sexual battery to eight years, for a total effective sentence of forty years.

THOMAS T. WOODALL, JUDGE