

NUMBER 13-08-00205-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

REBEKAH RACHELL SHROPSHIRE,                                    **Appellant,**

**v.**

THE STATE OF TEXAS,                                    **Appellee.**

**On appeal from the 24th District Court of DeWitt County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza**
**Memorandum Opinion by Justice Garza**

A DeWitt County jury convicted appellant, Rebekah Rachell Shropshire, of murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2003). Shropshire was sentenced to seventy-five years' imprisonment. She now appeals the conviction, contending by three issues that: (1) she was denied a fair and impartial trial due to ineffective assistance of counsel; (2) the evidence was factually insufficient to support the jury's verdict; and (3) the sentence imposed constitutes cruel and unusual punishment. We affirm.

## I. Background

On October 2, 2007, appellant was charged by indictment with the murder of her estranged husband, William Shropshire Jr. At trial, which commenced on March 31, 2008, the jury heard the testimony of several witnesses describing events that occurred on the afternoon of January 21, 2007, in Cuero, Texas.

Sam Jones, a patrol officer with the Cuero Police Department, testified that he received a dispatch on that day notifying him that a "hysterical female" had called 911 "claiming that she had stabbed her husband and she thinks he's dying." He proceeded to the scene, where he observed a black male laying on the floor of an apartment with appellant, who appeared "very upset," holding the victim in her lap. Officer Jones, a trained emergency medical technician, testified that when he attempted to assist the injured man, he "saw a large blood stain, fresh blood stain on the front of [the victim's] shirt. I lifted up the shirt and observed a—about a half-inch stab wound about two inches above his right nipple." Officer Jones stated that he could tell the wound was fairly serious because the victim was breathing only "about six times a minute" and the pulse in his carotid artery was "weak and slow." Officer Jones testified that he heard appellant say that she stabbed the victim. When asked whether appellant made a comment as to "how deep the wound might have been," Officer Jones replied in the affirmative and noted that "[s]he [appellant] said it only went in about an inch."

On cross-examination, Officer Jones acknowledged that appellant had the victim "cradled in her arms" when he arrived at the scene. He also agreed that appellant is "a petite or small individual" and that the victim appeared to be larger and heavier than she. However, when asked whether it would be fair to say that "[appellant] was attempting to help [the victim]," Officer Jones disagreed, noting that "it just seemed like she was—all she was doing was holding him. . . . She did not have the wound covered to try to control bleeding or anything like that."

2

Sergeant Santos Calderon, who accompanied Officer Jones to the scene, testified that the Shropshires' two minor children were present at the apartment where the incident took place. He further stated that:

> When we walked in or rushed into the apartment the—Mrs. Shropshire was crying and upset. We hadn't said anything at this point in time when she—when we heard her. Well, I know I heard her yelling that she—that she stabbed Mr. Shropshire and but at the same time she no sooner said that she added that but I only—I stabbed him once but it only went in about an inch.

According to Sergeant Calderon, appellant expressed to him that she had engaged in an argument with the victim and that "he had come at her one time" in the kitchen prior to the stabbing; however, appellant did not indicate that the victim attempted to choke her. Sergeant Calderon stated that he then asked appellant to locate the weapon that she used to stab the victim. Appellant responded by walking over to the kitchen sink and picking up a knife out of the sink.[1] The knife, which Sergeant Calderon stated appeared to be a steak knife, was recovered by police and was introduced into evidence at trial.

Sergeant Calderon acknowledged on cross-examination that: (1) the police did not check the apartment for any other weapons; (2) the police did not check other knives stored in a block in the kitchen of the apartment; and (3) the police did recover medications from the apartment belonging to appellant, which appellant had pointed out to them.

Officer Jeremiah Gatica of the Cuero Police Department was also dispatched to the scene. He testified as to appellant's remarks to him when he arrived:

> Rebekah stated that William had just arrived from the grocery store and that William had given her—their son something to eat. Rebekah stated that she was upset with William because of the fact that he did not give her son enough food to eat. She stated that she then went to the kitchen counter and began slicing bread with a knife. Rebekah stated that William was cursing at her and that he was approaching her from behind. Rebekah stated that she did tell him to leave; however, he didn't. Rebekah stated that at that point she stabbed him with a knife.

---

[1] This testimony was corroborated by Officer Jones, who overheard Sergeant Calderon asking appellant "where the knife was," as well as appellant's response.

3

Officer Gatica noted that appellant never stated that the victim struck or choked her prior to the stabbing.

Lieutenant Chris Hernandez, an investigator with the Cuero Police Department, testified that he attempted on several occasions to contact appellant in order to take her formal statement. According to Lieutenant Hernandez, he was never able to speak with appellant but, rather, was told by appellant's father that her attorney had advised her not to talk with police.

Medical examiner Ruth E. Kohlmeier, M.D., testified that she performed an autopsy on the victim. Dr. Kohlmeier opined that the cause of the victim's death was a stab wound to the chest and that the depth of the wound was, in fact, around three to five inches. She further stated that she could clearly observe where the knife had traveled through the victim's body—through the skin, ribs, the right lung, and penetrating the right atrium of the heart. Dr. Kohlmeier testified that the wound was consistent with an "overhand swing" of the knife because the knife blade traveled "right to left, downward and front to back." She further observed that "the entire knife blade went through the body all the way to the handle because you have the hilt mark [on the victim's chest]." According to Dr. Kohlmeier, "[a] tremendous amount of force" would have been necessary to inflict the damage that she observed.

Appellant's father, James Jackson, testified in her defense. Jackson stated that he resides at the apartment where the stabbing took place and that on January 21, 2007, he was living there with his son as well as with appellant and her two young children. He stated that he had left the apartment with his son to go to Victoria before the incident in question occurred. At that time, according to Jackson, there were several weapons in the apartment, including a shotgun and two rifles. Jackson stated that he never kept the weapons loaded while his grandchildren were in the apartment.

Jackson further testified that appellant and her husband were separated for several

4

years as of January 2007, and that he did not allow his son-in-law to enter the residence without his permission. According to Jackson, appellant is a "very bad asthmatic," is "disabled," and is receiving social security disability benefits. Jackson stated that he was concerned about his daughter when he left the house on January 21, 2007, because "she had been sick the night before with asthma."

Appellant then took the witness stand after being admonished by the court as to her right not to testify. She stated that she did not murder her husband, nor did she intend to stab him. Appellant stated she was "legally disabled" due to asthma and major depressive disorder. When asked about how she felt on January 21, 2007, appellant stated:

> I was very weak, very weak and very tired because I was out of breath. They had applied [sic] me on some—they gave me a steroid shot a couple nights before in E.R., and I was taking other medications due to the asthma that I automatically take and due to the major depression. So I was very, very weak, very tired. I wasn't eating right so my nutrition was not right and sometimes I would faint and a lot of times I couldn't get of bed.

According to appellant, her husband came to the apartment at around 3:00 p.m. on January 21, 2007, at which point she asked him to leave because her father was not present. In response, "[h]e said he was not going to go anywhere because he just wanted to spend some time with his kids and he had the right." Approximately fifteen minutes after her husband arrived, appellant heard her son crying "[at] the top of his lungs." She stated that she and her husband then "got into an argument because my husband had hit my son." Appellant described what happened next:

| A. [Appellant] | And he got in my face and told me he was not going to go anywhere. . . . And I told him I said I'm sick. I don't feel too well. I'm weak and I don't feel like arguing could you please leave and he said no. And he started hitting me upside the head with his hand . . . . In my mind I was just hoping that my father would hurry and come home so I didn't try to call 911. I wasn't thinking of doing anything like that because I thought my dad would come home any minute and when I asked Mr. Shropshire the third time I said could you please go, you do not belong here. He got extremely upset and he said he |

5

was not going anywhere and he rushed me against the stove and tried—and started choking me.

Q. [Defense counsel]     What happened after that?

A.     After that he jumped back and he walked into the living room and he fell to the floor.

Q.     What did you do?

A.     I went running towards Mr. Shropshire and because I thought he had—he was having a seizure and I looked down at him and I seen blood on his shirt and I hurried up and I attempt to call 911 and I asked the dispatch woman to please get me help because I had stabbed my husband but it wasn't something that I intentionally wanted to do and it wasn't something that was done [with] intent. I mentioned I had stabbed him because I wanted them to hurry and that's something that happened after effect [sic].

The jury found appellant guilty of murder as alleged in the indictment. Subsequently, several of appellant's friends and acquaintances, along with appellant's counselor, testified at the sentencing phase of the trial, urging leniency on behalf of appellant. The jury assessed appellant's punishment as seventy-five years' confinement in the Institutional Division of the Texas Department of Criminal Justice. Appellant then filed a motion for new trial, contending in part that her sentence was unconstitutionally cruel and unusual. *See* U.S. CONST. amends. VIII, XIV; TEX. CONST. art. I, § 13. That motion was overruled by operation of law. *See* TEX. R. CIV. P. 329b(c). This appeal followed.

## II. DISCUSSION

### A.     Ineffective Assistance of Counsel

By her first issue, appellant contends that she was denied a fair and impartial trial due to the ineffectiveness of her trial counsel. She argues specifically that her counsel was ineffective because he failed to object at trial to the admission of testimony by Lieutenant Hernandez regarding appellant's "refusal to provide a statement or be interviewed by law

6

enforcement."

To establish a claim for ineffective assistance of counsel, appellant must show (1) her attorney's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for her attorney's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 664, 668 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.). Whether this test has been met is to be judged on appeal by the totality of the representation, not by any isolated acts or omissions. *Jaynes*, 216 S.W.3d at 851. The burden is on the appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Id.* Our review of counsel's representation is highly deferential, and we will find ineffective assistance only if the appellant overcomes the strong presumption that her counsel's conduct fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. Further, the acts or omissions that form the basis of appellant's claim of ineffective assistance must be evidenced by the record. *See Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999); *Jaynes*, 216 S.W.3d at 851. In most cases, a silent record which provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); *Thompson*, 9 S.W.3d at 813-14.

A defendant's post-arrest silence may not be used against her at trial. *Sanchez v. State*, 707 S.W.2d 575, 578 (Tex. Crim. App. 1986); *Nixon v. State*, 940 S.W.2d 687, 692 (Tex. App.–El Paso 1996, pet. ref'd). A comment on a defendant's post-arrest silence violates the defendant's right to be free from compelled self-incrimination. *Doyle v. Ohio*, 426 U.S. 610, 617-18 (1976); *Sanchez*, 707 S.W.2d at 578; *Sutherlin v. State*, 682 S.W.2d 546, 548 (Tex. Crim. App. 1984); *see* U.S. CONST. amend. V; TEX. CONST. art. I, § 10. Such a comment is akin to a comment on the defendant's failure to testify at trial, because

it attempts to raise an inference of guilt arising from the invocation of a constitutional right. *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995).

Here, appellant argues that her trial counsel should have objected to Lieutenant Hernandez's testimony that he unsuccessfully attempted on several occasions to contact appellant in order to take her formal statement regarding the events of January 21, 2007. Appellant contends that "[s]uch testimony was a direct comment on Appellant's assertion of her Fifth Amendment rights prior to trial" and that "there is no trial strategy that can be asserted to justify such failure to object." In response, the State argues that: (1) Lieutenant Hernandez's testimony was admissible because appellant's counsel had previously "opened the door" to such testimony by asking Sergeant Calderon and Officer Gatica whether they took written statements from appellant; and (2) even if such testimony was inadmissible, counsel was not ineffective for failing to object because such failure may have been the product of a valid trial strategy.

Without determining whether the testimony was in fact admissible, we agree with the State that counsel's failure to object was not unreasonable. Lieutenant Hernandez stated that he made several attempts to take appellant's statement, but that he was told at each juncture that appellant's attorney had advised her not to speak with law enforcement. As the State notes, it is conceivable that counsel was employing a valid trial strategy by declining to object to this testimony. Specifically, the strategy may have been to show that appellant in fact wanted to speak to police about the incident but that her attorneys—who had been replaced by new counsel prior to trial—did not allow her.[2]

---

[2] In fact, appellant appeared to make this argument in her testimony, as shown by the following exchange:

> Q. [Defense counsel]  Mrs. Shropshire, did you have to get up here and testify in front of this jury?
>
> A. [Appellant]  No, I did not. I could have pleaded the fifth.
>
> Q.  Okay. But you—you got up here and testified that you told the truth?

Further, by objecting, counsel may have drawn attention to the fact that appellant declined to give a formal statement to police; it is conceivable that counsel decided not to object in order to avoid this.

Without anything in the record establishing counsel's reasons for not objecting to Lieutenant Hernandez's testimony, we cannot say that counsel performed unreasonably. *See Mallett*, 65 S.W.3d at 63; *Thompson*, 9 S.W.3d at 813-14. We therefore conclude that appellant has failed to overcome the "strong presumption" that her trial counsel provided reasonable assistance. *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. Appellant's first issue is overruled.

## B.    Factual Sufficiency of the Evidence

Appellant argues by her second issue that the evidence adduced at trial was factually insufficient to support her conviction. In conducting a factual sufficiency review, we consider all the evidence in a neutral light and ask whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008) (citing *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). The verdict will be set aside only if (1) it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, or (2) it is against the great weight and preponderance of the evidence. *Watson*, 204 S.W.3d at 415 (citing *Johnson v. State*, 23 S.W.3d 1, 10 (Tex. Crim. App. 2000)).

Factual sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App.

---

A.          Because I told the truth. I wanted my testimony to be heard.

Q.          Okay. Well, if you wanted your testimony to be heard, there has been some questions raised that you had a chance[—]according to Lieutenant Hernandez[—]a chance to tell your story before?

A.          Yes, sir, I did, but the counsels I had at that time would not want me to tell my story. They wanted me to stay quiet and say I was insane[. T]hat's why I fired them because I wanted to testify.

9

1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Under a hypothetically correct jury charge, appellant committed the offense of murder if she (1) intentionally or knowingly caused her husband's death, or (2) intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused her husband's death. *See* Tex. Penal Code Ann. § 19.02(b)(1), (2). A person acts intentionally with respect to a result of her conduct when it is her conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (Vernon 2003). A person acts knowingly with respect to a result of her conduct when she is aware that her conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

Appellant argues that "the facts of the case lend themselves clearly [to the conclusion] that the death of William Shropshire was unintended and not [the] result of an intentional act." Appellant points to the following undisputed facts in arguing that the verdict was against the great weight and preponderance of the evidence: (1) appellant was "distraught, hysterical, crying, screaming, and falling to the floor" immediately after the stabbing; (2) she cradled the victim in her lap after the stabbing; (3) the apartment "was full of other potential weapons" which appellant could have used, but did not use, to kill the victim; and (4) appellant is a severe asthmatic while the victim was a "taller, bigger, fit man." Nevertheless, the evidence also established that: (1) appellant got into an argument with the victim just prior to the stabbing; (2) she did not tell anyone at the scene of the incident that the victim had choked her or that she was acting in self-defense; and (3) a "tremendous amount" of force would have been necessary to cause the injury sustained by the victim. Appellant argues that such a wound "is more consistent with the decedent approaching Appellant and forcing himself into her, not knowing of the knife she had in her hands." However, even if we were to agree with this inference, we may not substitute our own determination for that of the jury. *See Ortiz v. State*, 93 S.W.3d 79, 87-88 (Tex. Crim. App. 2002) (citing *Wesbrook v. State*, 29 S.W.3d 103, 112 (Tex. Crim. App.

10

2000)). Moreover, we may not "substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony." *Id.* The jury could have rationally concluded from the evidence adduced, including the medical examiner's testimony, that appellant possessed the requisite intent to sustain a conviction of murder. *See Grotti*, 273 S.W.3d at 283 (citing *Watson*, 204 S.W.3d at 414-15); *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) ("A jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of wounds inflicted on the victims.")

Considering all the evidence in a neutral light, we cannot say that the jury's verdict was so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, nor can we say that the verdict was against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 415 (citing *Johnson*, 23 S.W.3d at 10). Appellant's second issue is therefore overruled.

## C.    Cruel and Unusual Punishment

By her third issue, appellant contends that the sentence of seventy-five years' imprisonment imposed by the jury constitutes cruel and unusual punishment in violation of the United States and Texas Constitutions. *See* U.S. CONST. amends. VIII, XIV; TEX. CONST. art. I, § 13.

Appellant does not dispute that her sentence falls within the range allowable by statute. *See* TEX. PENAL CODE ANN. § 12.32 (Vernon 2003) (providing that a first-degree felony is punishable by imprisonment for life or for any term of not more than ninety-nine years or less than five years and a fine not to exceed $10,000). Generally, a punishment assessed within the statutory range is not considered cruel or unusual. *See Davila v. State*, 930 S.W.2d 641, 654 (Tex. App.–El Paso 1996, pet. ref'd); *Lackey v. State*, 881 S.W.2d 418, 420 (Tex. App.–Dallas 1994, pet. ref'd). However, it is possible for a sentence within the statutory range to nonetheless be ruled unconstitutional if it is "grossly

11

disproportionate" to the crime. *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991)[3]; *Solem v. Helm*, 463 U.S. 277, 290 (1983); *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992). Punishment will be considered "grossly disproportionate" to the crime only when an objective comparison of the gravity of the offense against the severity of the sentence reveals the sentence to be extreme. *Harmelin*, 501 U.S. at 1005. If we find the sentence to be "grossly disproportionate," we then consider (1) sentences imposed for other crimes in the same jurisdiction, and (2) sentences imposed for commission of the same crime in other jurisdictions. *See Solem*, 463 U.S. at 292; *McGruder*, 954 F.2d at 316; *Mullins v. State*, 208 S.W.3d 469, 470 (Tex. App.–Texarkana 2006, no pet.).

Appellant's entire argument on appeal with respect to this issue is as follows:

> The State did not call one witness to testify during the punishment phase, instead relying upon the evidence presented during the guilt/innocence phase. However, Appellant called four lay witnesses, all who knew Appellant and all who testified that leniency was warranted in this matter. The evidence produced by Appellant during her punishment phase was clearly that Appellant is a loving, caring[ ]person who is loved by many persons in her community and her church. More importantly, her therapist and counselor[ ]testified that the jury should be lenient with her as she could be rehabilitated and could lead an eventful life. The State, on the other hand, failed to show future dangerousness of Appellant.

The State generally agrees with the factual contentions made in appellant's argument, but argues that the evidence provided at the guilt/innocence phase of the trial, which the State re-offered at the punishment phase, was enough to support the seventy-five year sentence.

Comparing the gravity of the offense to the severity of the sentence, we cannot say that the seventy-five year sentence is "grossly disproportionate" to the crime in this case. The evidence established that the victim suffered a violent, forceful knife attack at the

---

[3] In *Trevino v. State*, we noted that the splintered nature of the decision in *Harmelin* has brought into question "the viability and mode of application of proportionate analysis in non-death penalty cases." 174 S.W.3d 925, 928 (Tex. App.–Corpus Christi 2005, pet. ref'd) (citing *McGruder v. Puckett*, 954 F.2d 313, 315-16 (5th Cir. 1992)). In that case, we assumed, for purposes of appellant's argument, the viability of a proportionality review, *see id.*, and we do the same here.

12

hands of his wife while their two children were present. The fact that appellant's friends and counselor believed that the jury should be lenient in sentencing appellant does not affect in any way our analysis of the gravity of the offense or the severity of the sentence.

We conclude that the sentence imposed is neither grossly disproportionate to the crime nor unconstitutionally cruel or unusual.[4] Appellant's third issue is therefore overruled.

## III. CONCLUSION

Having overruled appellant's three issues, we affirm the judgment of the trial court.

_____
DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 22nd day of October, 2009.

---

[4] Because we find that the sentence was not "grossly disproportionate" to the crime, we need not perform a comparative evaluation of sentences imposed for other crimes in Texas or for the same crime in other jurisdictions. *See Solem v. Helm*, 463 U.S. 277, 292 (1983); *McGruder*, 954 F.2d at 316; *Mullins v. State*, 208 S.W.3d 469, 470 (Tex. App.–Texarkana 2006, no pet.). We note, however, that appellant does not address this evaluation in her appeal, nor is there any evidence in the record pertaining to it.